Gustave **GERSTLE** and Muriel Silverstein, Fannie Davenman, Stanley Nathanson, Irwin Kamin and Harold Berliner, d/b/a Miths & Company, M. Martin Nathanson, Raoul L. Rousseau and Wilma L. Rousseau and I. Stanley Kriegel, Plaintiffs,

v.

**GAMBLE–SKOGMO, INC.,** Defendant.

No. 64–C–1253.

United States District Court
E. D. New York.

March 7, 1969.

Emanuel Becker, New York City, for plaintiffs.

Lord, Bissell & Brook, Stephen A. Milwid, David M. Gooder, Charles H. Weiland, R. Michael Stillwagon, Chicago, Ill., Holtzmann, Wise & Shepard, James W. Deer, New York City, for defendant (Edmund H. H. Caddy, New York City, of counsel).

BARTELS, District Judge.

This is a class suit by minority stockholders of former General Outdoor Advertising Co., Inc. (General) against Gamble-Skogmo, Inc. (Skogmo), seeking an accounting and restitution arising out of the merger of General into Skogmo. The claim is predicated upon various grounds including breach of fiduciary obligations by Skogmo as a majority stockholder of General, illegality of the merger and misrepresentations contained in the proxy material.

Plaintiffs and intervening plaintiffs are citizens and residents of the State of New York and were at the time of the merger on October 17, 1963, holders of 6,580 shares of stock of General, one of whom had owned 100 shares since February, 1961. Since the merger, some of the plaintiffs and intervenors have exchanged their shares of stock for Skogmo's stock. General was a New Jersey corporation with its principal place of business in Chicago, Illinois, and Skogmo is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

Federal jurisdiction is founded upon diversity of citizenship and violation of Section 17(a) of the Securities Act of 1933, as amended (15 U.S.C.A. § 77q), (1933 Act), and violations of Section 10 (b) and 14(a) of the Securities Exchange Act (15 U.S.C.A. §§ 78j and 78n (a)), (1934 Act), and Rules 10b–5 and 14a–9 of the Securities and Exchange Commission.

## COMPLAINT

The allegations pertinent to the asserted violations of the fiduciary obligations and of the 1933 and 1934 Acts charge that from February, 1962 until the date of the merger Skogmo and its key officers owned 50.1% of General's stock, controlled the affairs of General, its board of directors, executive committee and officers, and between June, 1962 and October, 1963, caused General to sell a substantial portion of its outdoor advertising properties at a profit resulting in an unnecessary tax of approximately $6,000,000, which could have been avoided had General been liquidated for the benefit of the stockholders; between May, 1962 and October, 1963 Skogmo caused General through a subsidiary, General Outdoor Realty Corp. (GOR) to assume certain financial commitments of Skogmo in order to assist Skogmo to obtain control of other companies which Skogmo intended to own and operate, in violation of General's charter; in February, 1963 Skogmo determined to merge with General and liquidate the remaining General outdoor advertising assets after giving the stockholders of General shares of convertible preferred stock of Skogmo of the par value of $40 per share with a market value of $37 per share, in exchange for stock of General whose assets upon liquidation were worth $63 per share and after recoupment of General's assets diverted by Skogmo for its own purposes, $68 per share; and to accomplish the merger Skogmo caused General's directors to vote in favor of the merger and also to circulate a false and misleading proxy statement, in violation of the 1933 and 1934 Acts and the rules issued thereunder. Plaintiffs assert that the merger was illegal because it did not comply with the New Jersey corporation laws and that the proxy statement was misleading in

that, among other things, it failed to disclose (i) the excess worth upon liquidation of the General assets above the value fixed by the merger terms; (ii) the intention of Skogmo to liquidate the General assets at such excess value after the merger pursuant to prior mis-understandings; and (iii) the illegality of the merger.

Aside from the claim of breach of trust on the part of Skogmo in conducting General's affairs for the benefit of Skogmo, the crucial thrust of the complaint is the contention that Skogmo failed in the proxy statement to disclose the true value of General's outdoor advertising plants and its intention to sell those assets immediately after the merger at an expected profit of approximately $15,000,000, thus depriving the General stockholders of an undiluted interest in such capital gains realized on the sale of the General assets within nine months after the merger.

Plaintiffs moved for a summary judgment before Judge Dooling who, while denying the motion, made a limited adjudication of the facts under Rule 56 (d), Fed.Rules Civ.Proc., 28 U.S.C.A., which while deemed to be established without substantial controversy are nevertheless subject to such modification and additions revealed by the testimony at the trial to prevent manifest injustice. Audi Vision Inc. v. RCA Mfg. Co., 136 F.2d 621, 147 A.L.R. 574 (2d Cir. 1943). After hearing the evidence, these findings are adopted by this Court subject to such clarification, embellishment and additions as appear from the following.

I

GENERAL BACKGROUND

The background of this controversy has been developed at considerable length through many pages of testimony and innumerable exhibits, the substance of which it is necessary to narrate in order to properly focus and resolve the critical issues. This is singularly true with respect to the issues of Skogmo's intent to sell and liquidate General's properties after the merger. While it is impossible to delve into the human mind, a course or pattern of human conduct may be such that the implication of the existence of a particular state of mind is not only permissible but frequently inescapable. Union Pacific R. Co. v. Chicago and North Western Ry. Co., 226 F.Supp. 400 (N.D.Ill.E.D.1964).

In and before 1961–1963 Skogmo was engaged, directly and indirectly, through subsidiaries and franchised dealers and discount centers in the United States and Canada, in the wholesale and retail merchandising of durable and soft goods including major appliances, automotive equipment, hardware, furniture and floor coverings. It also purchased and financed the retail installment obligations acquired by owned and franchised stores. During the same period of 1961–1963, General was engaged in various aspects of the outdoor advertising business and was the largest company in that industry in the United States. Its principal outdoor advertising activities were the display of advertisers' copy in the form of posters or paint bulletins upon outdoor structures owned by the company and located on sites leased for that purpose or, in some instances, on property owned by the company. In 1957 General acquired over 96% of the capital stock of Claude Neon Advertising, Limited, the largest outdoor advertising company in Canada, and in 1959 the company entered the Mexican market by acquiring 100% of the capital stock of Vendor, S.A., the largest Mexican outdoor advertising company. In the latter half of 1961 General was operating 36 branches, providing outdoor advertising in over 50 principal metropolitan areas in the United States. As an incident to its business, it owned approximately 600 parcels of real estate on which were located its offices, studios, manufacturing facilities and advertising display plants. During 1960 and 1961 General entertained proposals by persons desiring to purchase outdoor advertising plants and particularly from those who offered to purchase plants in major cities where there was direct local poster competition plus resulting low profit margins.

Thereafter, between April 27, 1961 and March, 1962, Skogmo acquired 50.12% of the General stock as follows: (a) 310,-958 shares at $40 per share in 1961, by an offer to General stockholders made through Allen & Co.; (b) 150,118 shares at $42 per share in 1962, by a second offer to General stockholders made through Allen & Co.; (c) 139,460 shares between December 8, 1961 and May 29, 1962, in exchange and off-the-market transactions; and (d) 98,000 shares at $42 per share in 1962, from Burr L. Robbins, General's president since 1925 and also at the time of the merger. After the acquisition by Skogmo of control of General, a number of transactions and sales were consummated which it is necessary to relate in order to comprehend the value of the properties, the purpose of the merger and the intent of Skogmo as the surviving corporation.

On October 31, 1961, Bertin C. Gamble, Chairman of the Board of Directors and controlling stockholder of Skogmo, was elected to the Board of Directors of General. On January 25, 1962, Roy N. Gesme, a retired vice-president of a bank and a former consultant to Skogmo, was also elected a director of General and functioned as a liaison man between Skogmo and General. In April, 1962, two vice-presidents of Skogmo, Gus S. Younger and Cyrus Rachie, were also elected members of the General board. While the General board of directors consisted of twelve, four were linked with Skogmo either as a director, officer or consultant. In April, 1962, Bertin C. Gamble personally negotiated a contract in the name of Skogmo and without the knowledge of General to engage one Donald E. Ryan as chief executive officer of General primarily in charge of sales of plants. Ryan had no previous experience in the advertising field, his experience being limited to the field of evaluating loan risks, especially construction loans and real estate mortgages. Thereafter Bertin C. Gamble assigned this contract to General which assumed the same. In the same month Ryan was elected a member of the board and executive vice-president of General and a member of its executive committee, effective May 1, 1962. Ryan was indisputably Skogmo's man at General and was expected to evaluate General's prospects and make recommendations to Skogmo for the future. Burr L. Robbins and George W. Caspari remained as president and vice-president, respectively, of General as the executives in charge of the company's operations. Of the remaining seven directors, four were associated with the company as officers or employees and three were outside directors.

### Problems Facing General

During the period of Skogmo's controlling stock ownership of General, 1961–1963, the general outdoor advertising business faced severe problems. One of the most serious was the competition for the advertising dollar by radio and television, which caused a serious deterioration in the national sales of outdoor advertising and classified the business as a declining industry. At the same time the national sales organization of the industry, Outdoor Advertising Institute (OAI), which in the past stimulated, created and provided national sales for the outdoor advertising industry as a whole, was in a state of disorganization and chaos, resulting from the resignation of many major plant owners and operators and the absence of a president or leader who could inspire the confidence of the members. This lack of unity and leadership led to the loss by General of a number of national advertising accounts across the country. At the same time new governmental restrictions, federal, state and local, were imposed upon the use of outdoor advertising boards and bulletins which not only limited the available space for such advertising but at the same time created an adverse public image in the industry.

### Decline in General's Operating Profits

Early in January, 1962, Gesme, liaison between Skogmo and General, learned from Donovan Olson, senior vice-president of General, and Robbins that

the fourth quarter operations for 1961 were disappointing and that the income from the advertising plants for the year 1961 was down from $1,540,000 in 1960 to approximately $1,125,000 in 1961. Although the New York plant was the only plant showing an actual loss, many other plants indicated a reduced rate of return on their respective investments. In March, 1962, Gesme received from Olson a detailed report of the property and earnings of General in book form (hereafter referred to as the "Green Book") prepared at Gesme's request by Olson and Robbins, from which it was also evident that the rate of return on the outdoor advertising business was declining.

Ryan, upon assuming his duties, in May, 1962, made an intensive study of General's business and plants for Bertin C. Gamble and concluded that the advertising plants could not be operated profitably and should be sold. At this time and since the late 1950s, General had been earning approximately 3% upon the estimated sales value of its outdoor advertising assets, which return was considered inadequate by both General and Skogmo. As advertising plants were sold, administrative and overhead expenses for the remaining plants were increased since practically the same costs were charged to fewer plants. On June 22, 1962, Walter Davies, treasurer of Skogmo, so advised Bertin Gamble. Consequently the operating profits of the remaining plants of General in 1962 were less than the profits of those plants in 1961. By the end of 1962, General had sold 23 of its 36 plants including 7 of the 11 plants [1] listed by Burr Robbins at a July Board of Directors' meeting as the top earners in the system. These sales naturally depressed the morale of the remaining employees.

Despite the poor performance of General in 1961 and 1962, Burr Robbins expected a turn-around in 1963 based

upon the following anticipations: (a) a decline in anti-outdoor advertising public opinion; (b) an increase in national advertising as a result of a reorganization of OAI; and (c) a sharp reduction of overhead and administrative expenses plus improved employee morale. However, Robbins' hopes were dispelled in June of 1963 and earlier by the monthly income figures from all of General's plants, which were considerably less than those for the corresponding month of 1962.[2] The 1963 Claude Neon operations in Canada were also discouraging, the monthly income figures being less in 1963 than those for the corresponding months in 1962. Robbins admitted that in July, 1963, the second quarter figures of the company's operations ending June, 1963, "made you sick to your stomach".

## II

### SALES OF PLANTS PRIOR TO MERGER

*1962 Sales*

The first sale which created a "break through" in the sale prices of outdoor advertising plants, was the sale of General's competitive plant in St. Louis, which was negotiated in January, 1962. This occurred shortly prior to the time Skogmo obtained stock control of General. The price was fantastic and established a far higher sales price than had previously existed with respect to the sale of outdoor advertising plants and apparently provided the yardstick for the plant values shown in Gesme's "Green Book," which were in excess of the actual book values.

On July 2, 1962, B. C. Gamble announced to the press his intention to have General sell its "less profitable" and "competing plants". Subsequently, on July 10, 1962, B. C. Gamble addressed a meeting of General executives in Minneapolis at which he expounded his policy

---

1. Raleigh, Indianapolis, Atlanta, Jacksonville, Denver, Memphis, Omaha, leaving unsold Chicago, Philadelphia, Washington and Claude Neon.

2. The figures for the New York plant were an exception to the extent that there was a reduction in losses.

of "corporate mobility" and diversification, predicated upon the sale of less profitable General plants and the investment of the proceeds in more profitable and diverse growth projects. The recent sale of General's St. Louis plant, coupled with a statement of B. C. Gamble's philosophy on July 2, 1962, stimulated a strong buyer interest in the potential sale of other General advertising plants which emanated primarily from three sources: (1) owners of plants in competition with General's plants; (2) owners of radio and television stations and advertising agencies having contacts with national advertisers; and (3) affluent persons seeking a tax shelter by means of a large depreciation write-off and an increased tax base for depreciation purposes. Under the ownership of General, the plants had been almost fully depreciated but when transferred to a new purchaser, a stepped-up basis for depreciation would be available, based upon the purchase price of the physical plant. From the high depreciation write-offs a favorable cash flow resulted, which in turn assisted the purchaser in paying from the operations the high initial purchase price.

While Robbins was still interested in maintaining, as far as possible, the operations of the outdoor advertising plants, Ryan, on the other hand, was doing his utmost to sell the advertising plants. Ryan's and Robbins' objectives were substantially different and resulted in a form of corporate schizophrenia. For instance, Robbins, prior to the General board meeting on July 2, 1962, delivered to B. C. Gamble a list of what Robbins considered General's most profitable plants from an operating viewpoint, and he recommended their retention as a nucleus of operation. B. C. Gamble agreed and the list of plants was noted upon the minutes of the board meeting; but Ryan continued to solicit offers for the sale of all the plants and in July and August, 1962, he mailed to prospective purchasers, including those who had made inquiries, 5-year operat-

ing statements of General's plants. These were then supplemented in September, 1962 by 8-year earning projections for each plant and circulated to those interested. The first page of each projection computed the selling price of the branch and indicated that 29% of the selling price could be paid in cash and the balance could be paid out of 8-year earnings, leaving the purchaser with an investment and cash surplus. Ryan's merchandising of the plants included attempts to sell a group of plants in a one-package deal, often combining a large plant in a geographical area with smaller surrounding plants and in particular attempting to package the New York plant, which was losing money, with other more profitable plants such as Philadelphia, Washington, Chicago or Harrisburg, as sweeteners. Subsequent to the St. Louis sale and through October 1, 1962, General completed sales involving 12 plants in eight separate deals for a gross sales price of $11,879,200.

### Suspension of General's Sales

Two questions were raised by General's counsel in late 1962 causing the suspension of plant sales. General had received a large volume of purchasers' notes in connection with the prior sale of its plants, and had also made a substantial investment in the stock of Allegheny Corporation. These facts stimulated counsel to question, in early October, 1962, whether General might be an investment company within the purview of the Investment Company Act of 1940. Although offers were being negotiated pending a solution of the problems, the officers of General, in early October, 1962, decided to suspend sales. Some of the suspended sales were: (1) the sale of the competitive Kansas City plant to Howard J. Stalcap, which was fully negotiated in October; (2) the sale of Akron, Dayton, Indianapolis, Youngstown, Denver, Duluth and Omaha plants to a group headed by Curtis L. Carlson of Minneapolis for approximately $10,000,-000, the terms of which were near agree-

ment in early October; and (3) an offer of $1,000,000 for the Oklahoma City plant—which amount was almost its Green Book value—made by George C. Marden on October 29, 1962, the reply to which was postponed by Ryan. In 1963 George C. Marden purchased this plant for the amount of his October offering. Counsel also raised the question by letter dated November 27, 1962, whether the continued sales by General of its outdoor advertising plants and the resulting change in the character of its business necessitated the approval of its stockholders.[3]

In December, 1962, the Securities and Exchange Commission instituted an investigation to ascertain whether Skogmo was an investment company and in this connection subpoenaed General's officers. In January, 1963, extensive hearings were held and one of the important issues relative to a potential violation of the Investment Company Act was the ownership by both General and Skogmo of the stock of the Allegheny Corporation. Due to this investigation General in January, 1963, again postponed sales of its plants.

### Resumption of Sales and Financing of General's Notes

Since more than 70% of the purchase price for the plants sold was payable in notes, B. C. Gamble and Walter Davies, in November, 1962, approached The First National Bank of Chicago (with which Skogmo had prior banking relationships) with a proposition of financing these notes. Davies was instrumental in forming a syndicate consisting of the First National and three other banks which agreed to purchase $14,000,000 of the 6% purchasers' notes then held and endorsed by General. The purchase price was the face value of the notes at an interest rate of 5%, the extra 1% being set aside by the syndicate, to be paid to General

upon full payment of the notes. Thereafter, on December 19, 1962, a final modified and expanded agreement was reached with Carlson involving the sale of eleven [4] of General's plants, for a gross purchase price of approximately $14,000,000. Following the Carlson agreement, the original note purchase agreement with the banking syndicate was replaced on December 26, 1962, by a new agreement to purchase up to $55,000,000 of purchasers' notes endorsed by General, upon the same terms as the former agreement, although approximately $13,000,000 additional purchasers' notes were then available for sale.

With the proceeds of the sales of the branches and the sales of the notes, General retired certain long-term debts and applied the remainder to the purchase of other interests. One of the acquisitions was the purchase for cash of approximately 98% of the stock of Stedman Bros., Limited, a Canadian corporation operating a chain of small wares stores (*infra*), which acquisition apparently solved General's potential difficulties under the Investment Company Act, thus permitting the management to resume plant sales. Accordingly, form letters were sent on December 18, 20, 21, 26, 1962, by Ryan and others announcing the resumption of plant sales, pursuant to which all plants were offered for sale with the exception of Minneapolis. At this time the management had available the "Green Book", a reference book setting forth the valuation of each plant, and also a memorandum of William H. Dolan, controller of General, dated November 28, 1962, showing an up-to-date valuation of General's remaining plants based upon the experience of prior sales of other plants and the offers made by R. Edward Turner for three plants [5] and by Curtis L. Carlson for eleven plants. Again this memorandum showed

3. The board of directors of General, in January, 1963, approved a resolution authorizing the executive committee to obtain the authorization of stockholders for further sales if deemed advisable, which the executive committee never deemed necessary.

4. Akron, Indianapolis, Youngstown, Denver, Duluth, Omaha, Asheville, Kinston, Raleigh, Winston-Salem, and Jacksonville.

5. Atlanta, Richmond, Roanoke.

plant values substantially in excess of the book values of the plants.

*Summary of 1962 Sales*

At the end of 1962, as appears from the following table, General had sold 23 of its 36 plants for a gross purchase price of $29,832,260 ($5,247,506 in cash and $24,584,754 in notes) including 7 of the 11 plants included by Robbins in his list of plants to be kept.

| Date Sale Closed | Branch | Gross Sales Price | Cash | Notes | Purchaser |
|---|---|---|---|---|---|
| 3/1/62 | St. Louis | $ 2,953,000 | $653,000 | $ 2,300,000 | St. Louis Outdoor |
| 6/30/62 | Louisville | 1,625,000 | 300,000 | 1,325,000 | Alwes Outdoor |
| 7/31/62 | New Orleans | 1,899,642 | 433,780.32 | 1,465,861.40 | Industrial Outdoor |
| 8/31/62 | Davenport | 288,903 | 72,225.75 | 216,677.25 | Tri-City Posting |
| 8/31/62 | Cedar Rapids Sioux City & Sioux Falls | 858,000 | 214,500 | 643,500 | Stoner-McCray |
| 8/31/62 | Peoria | 520,000 | 144,000 | 376,000 | Logeman Outdoor |
| 8/31/62 | Atlanta Richmond Roanoke | 4,071,339 | 730,000 | 3,341,399 | Turner |
| 8/31/62 | Nashville | 928,661 | 270,000 | 658,661 | John R. Ozier |
| 10/1/62 | Memphis | 1,687,715 | 375,000 | 1,312,715 | King & Stanley |
| 12/31/62 | Dayton | 975,000 | 195,000 | 780,000 | Dayton Outdoor |
| 12/31/62 | Akron Indianapolis Youngstown | 4,300,000 | 860,000 | 3,440,000 | Carlson |
| 12/31/62 | Denver Duluth Omaha | 4,725,000 | | 4,725,000 | Carlson |
| 12/31/62 | Asheville Kinston Raleigh Winston-Salem Jacksonville | 5,000,000 | 1,000,000 | 4,000,000 | Carlson |
| | Total 1962 | $29,832,260 | $5,247,506.07 | $24,584,754.65 | |

The remaining plants included many of the smaller plants and three competitive plants. During the same period Gesme and Ryan indicated a willingness to sell Philadelphia, Washington and Chicago, three of the other plants on Robbins' list, as sweetners in a package deal for New York.

*Pre-Merger 1963 Sales*

Defendant, relying on the testimony of Gesme and Robbins, explains the drop in pre-merger sales in 1963 with the assertion that acceptable offers "dried-up" during that period. Plaintiffs claim that acceptable offers were available in 1963 but were not accepted because of (i) Skogmo's Investment Company Act problems; (ii) the threatening necessity of shareholder approval for further sales; and (iii) the intentional postponement of sales until the resolution of the question of possible consolidation of the two companies. The record supports the plaintiffs' position. In fact, Robbins testified on cross-examination that between October, 1962 and October, 1963 General was unprepared to accept offers except those for which previous commitments had been made.

In the early part of 1963 General updated its 8-year projections for its unsold plants to include 1962 operating results and forwarded them to prospective purchasers. On January 31, 1963, the closing of the agreement of sale for the Kansas City plant made with Stalcap, Inc. was consummated at a purchase price of $2,300,000. In the same month Ryan wrote, in response to purchasers' inquiries, that all sales were being suspended. On February 18, 1963, Donald May, secretary of General, prepared for submission to the Securities and Exchange Commission, a memorandum showing the market value of domestic advertising plants as being $19,924,638 in excess of book value, and the market value of the shares of Claude Neon as being $10,164,768 in excess of adjusted cost to General. On March 5, 1963, Ryan received an offer from Allan Kander, a business broker, on behalf of Wayne Rollins, president of Rollins Broadcasting Company, of $4,000,000 for the Philadelphia and Harrisburg plants. On the same day Allan Kander advised Ryan that Wayne Rollins had authorized him to negotiate upon an all cash basis for the purchase of all the unsold plants of General except those located within the greater New York City area. Nothing further was done about negotiating for all of the plants but Ryan did reject the offer for Philadelphia and Harrisburg as being too low, indicating a strong desire, however, to meet Rollins after March 21, 1963 for further negotiations, which meeting was never held. On March 11, 1963, Gesme prepared and submitted to Skogmo a report showing the "Green Book Value", "Probable Sales Value", "Cost on General's Books", and "Net Profit After Tax". The "Probable Sales Value" in each case was substantially in excess of the "Cost on General's Books" and the "Net Profit After Tax" on all plants totalled, according to his memorandum, $19,925,000. In the same month Brown Bolte raised to $850,000 an earlier bid of $750,000 for the Hartford plant, which he subsequently purchased after the merger for $900,000. On April 2, 1963, Gordon Fawcett made an offer of $700,000 to purchase the Binghamton plant, which offer remained unanswered until June 20, 1963, at which time General stated that another offer at a price equivalent to the "Green Book" value had been rejected.

While these offers were being received, the Board of Directors of General on April 11, 1963, adopted a resolution stating that for the present "GOA will continue to operate the plants operated by it excepting Oklahoma City where negotiations for sale are now pending", which resolution appeared in General's quarterly letter dated April 11, 1963 to its stockholders accompanying the quarterly statement of earnings. According to Robbins, this resolution was adopted to improve employee morale which had sunk to a low point as the result of plant sales and fear of loss of jobs and because Robbins thought that General was not in a position to sell further plants without stockholder approval. On May 31, 1963, General completed its sale to National Outdoor Advertising, Inc. for the Oklahoma City plant for $1,000,000, the October, 1962 offering price. During this period Kluge of Metromedia had continually made known to Ryan his interest in the Chicago plant.

On July 2, 1963, the proposed merger of the two companies was approved by the General board and on July 19, 1963 a draft of the proxy statement was filed with the S. E. C. Because any sale or agreement for sale thereafter would require a modification of the proxy material, General suspended the sale of plants and also serious negotiations with prospective purchasers. Nevertheless, in late September or early October, 1963, General sent to prospective purchasers an updated 8-year projection of earnings, taking into account operating results for the first nine months of 1963. B. C. Gamble testified that the market for the sale of plants remained good in 1962 and 1963, and Ryan testified that the market was better in early 1963 than after the merger because of the poor operating profits of the plants in the summer of 1963.

Including the two 1963 sales of the Kansas City and Oklahoma City plants, all the sales of the outdoor advertising plants made before the merger may be summarized as follows:

| Pre-Merger | Number of Plants | Book Value | Gross Sales Price | Gross Profit | Tax on Profit | Net Profit |
|---|---|---|---|---|---|---|
| | | (In Thousands of Dollars) | | | | |
| 1962 | 23 | $10,102 | $29,682 | $19,580 | $5,396 | $14,184 |
| 1963 | 2 | 1,145 | 3,300 | 2,155 | 632 | 1,523 |

*Investment of Proceeds of Sales*

A. Formation of General Outdoor Realty Corporation

It was the judgment of Walter Davies that segregation in a separate corporation of the 600 parcels of real estate owned by General would enable General to obtain greater borrowing power. Accordingly, at his suggestion, General formed in June, 1962, a wholly-owned subsidiary, General Outdoor Realty Corporation (GOR), to which it transferred all of its real estate. Because of the nature of its business, there was a high turnover rate of these small parcels, making an appraisal difficult. Consequently, the formation of GOR did not enable General to increase its borrowing leverage. Since it failed in its purpose, GOR in July, 1963 transferred its assets back into General. During the year of its existence, however, GOR performed the functions of a holding company for General's investments as hereafter appears.

B. Channing Corporation

Tied-in with Skogmo's and General's pattern of selling plants was a corollary principle of investing proceeds in promising enterprises. Thus in May and June, 1962, Skogmo, through an extension of its credit, acquired for General approximately 13.8% of the common stock of Channing Corporation; a Delaware corporation, engaged in writing lines of insurance and providing financial services. The purpose of the acquisition was to enable Channing to increase its profits by selling its insurance policies through the retail stores of Skogmo. General was unaware of the original purchase by Skogmo, but its Board subsequently approved the transfer of stock to GOR on June 29, 1962, after Davies explained the potentialities of the investment. Apparently the plan to merchandise Channing insurance policies through Skogmo's stores was unsuccessful. Less than four (4) months after the purchase, General caused GOR to sell its interest in the Channing Corporation to Curtis L. Carlson for $5,250,000 (the cost to GOR) at a time when the market for the shares was between $3,179,000 and $3,342,000. The sale was made for the purpose of obtaining funds to invest in the stock of the Allegheny Corporation.

As part of the transaction, Carlson was granted a one-year option to "put" or resell this stock to General, which, as later appears, was subsequently exercised for approximately $5,660,000.

C. Allegheny Corporation

On October 5, 1962, GOR accordingly purchased 750,000 shares of common stock of Allegheny Corporation for $7,-500,000, whose interests included investments in the New York Central Railroad and Investors Diversified Services, Inc. (IDS), which conducted operations similar to those carried on by Channing. At the same time, Skogmo purchased a similar number of shares for the same price. The combined purchase was slightly more than 15% of the outstanding common shares of Allegheny, and GOR's purchase was made at the suggestion of B. C. Gamble without the prior approval of General's Board of Directors. However, after Walter Davies again explained the advantages of the investment, the General Board on October 25, 1962, approved the purchase by GOR. Skogmo at the same time had a "put" and "call" agreement covering the shares of IDS, indicating the community of investments by the two corporations. Robbins thought that Allegheny offered to both corporations the possibility of controlling the New York Central Railroad which, in turn, owned many parcels of land upon which General could possibly erect billboards. As it turned out, Skogmo and General were unable to establish the working relationship with Allen P. Kirby, a controlling stockholder in Allegheny, necessary to effectuate the merchandising of the IDS services through the stores of Skogmo. GOR continued to own the Allegheny stock to the date of the merger.

D. Stedman Bros., Limited

For many years Skogmo had been interested in acquiring control of Stedman Bros., Limited, a Canadian corporation, which operated a chain of retail variety stores specializing in soft goods. In December, 1962, Skogmo suggested that General acquire control of this corporation and consequently on December 28, 1962, General purchased for $22,459,000 in cash approximately 98% of the outstanding shares of the common stock of Stedman at an approximate price of $20 per share. Again the purchase was initiated and accomplished through the assistance of Skogmo and, as discussed above, removed the threat of a violation by General of the Investment Company Act. The operations of Stedman stores in many ways complemented the operations of the McLeod stores, a retail chain owned by Skogmo, specializing in the sale of hard goods in Canada.

III

AGREEMENT TO MERGE

It is in this background and within this framework that the merger negotiations were entered into and finally agreed upon on July 2, 1963. In February and March, 1963, the possible consolidation between Skogmo and General was proposed to Walter Davies, treasurer of General, by Paul Judy, then vice-president of A. G. Becker & Co., Inc. (Becker). The desirability of consolidating the operations of General and the newly acquired Stedman stores with those of Skogmo and McLeod was an important factor in motivating the marriage. Consolidation also appealed to Davies as a step in simplifying Skogmo's complicated corporate structure and he requested Judy to submit a preliminary proposal. Becker was later engaged by both companies to review the terms of the merger and expressed an opinion (included in the proxy statement) that the terms of the merger were fair to the stockholders of both companies. The independence of this opinion has been attacked by the plaintiffs because of Becker's prior relationship with Skogmo. In early 1962 Becker, in association with Lehman Brothers, sold on behalf of one of Skogmo's wholly owned subsidiaries, $20,-000,000 principal amount of its Senior Subordinated Sinking Fund Notes and in the fall of the same year Becker, in association with Lehman Brothers, rendered services for Skogmo in obtaining

an amendment of Skogmo's $10,000,000 6% Notes, maturing 1965–1975, held by ten institutions.

On March 11, 1963, Becker submitted to Skogmo a preliminary memorandum relating to the possible acquisition by Skogmo of the remaining public shares of General by means of a voluntary exchange offer of Skogmo stock for General stock. In this memorandum Becker compared the earnings, dividends, book value and marketability of General and Skogmo common stock and analyzed the basic advantages and disadvantages of two possible offers. The first was an exchange on a share-for-share basis, in which Becker stated that Skogmo would pick up $37 a share in book value per Skogmo share issued, which book value would be "approximately $13 under estimated final liquidation value per share, taking the book value of the Stedman and Allegheny investments, and other non-plant assets, as the fair market value." By such a share-for-share exchange, Becker stated that Skogmo "would be implicitly selling its own new shares of common stock at about $50 * * * providing steps with respect to the liquidation of GOA prove out as expected". The second was an exchange of one share of new Skogmo's $20 convertible preferred 5% stock (convertible initially into ½ share of Skogmo's common) plus ½ share of Skogmo's common for one share of General's common stock, which was considered more likely to be acceptable to General's stockholders. Either offer would have required registration under the 1933 Act.

In a March 19, 1963 memorandum to Walter Davies, W. P. Berghuis, a director, senior vice-president, secretary and general counsel of Skogmo, reviewed the Becker memorandum and also the alternative of a statutory merger. In this memorandum he indicated, among other things, that the merger would not require registration but that the proxy statements "would have to be very complete in the matters disclosed to the stockholders of both companies" and further that "Where as here, one of the constituent corporations *already owns the controlling block of stock in, and hence controls the management of, the other constituent corporation,* it is of tantamount importance that the exchange offer in any merger be fair to the minority stockholders in GOA" (emphasis added). He concluded that experts, not excluding Becker as a possibility, might be employed to assist in determining a fair stock exchange ratio to prevent overreaching or unfairness.

In May, 1963, both companies engaged the services of Becker to assist them in connection with the possible consolidation, which ultimately resulted in agreement between the managements of Skogmo and General on the statutory merger. As early as May, 1963, Skogmo decided to offer to General's stockholders $40 4½% preferred stock, convertible into Skogmo's common stock on a share-for-share basis and callable after 5 years beginning at $42.50. The terms of the merger were informally agreed upon during June, 1963, and were formally approved by the Board of Directors of each company on July 2, 1963.

Becker then prepared and submitted to the Boards of Directors of Skogmo and General a memorandum, dated July 1, 1963, upon the "Fairness and Equitability of the Plan of Merger". The memorandum discussed the relative market value, dividends, security, rights, permanency, historical, current, and prospective earning power of the shares of the respective corporations and also potential values arising out of further sales of plants. The report stated that any investor in General's shares could, either alone or with an investment adviser, estimate the potential sale value and related income of retained plants and also recognize the problems and risks associated with profits from such sales including the obligor's ability to repay any purchase money notes. In conclusion Becker stated that, in its opinion, the plan was fair and equitable.

The Board of Directors of Skogmo and General approved the terms of the merger on July 2, 1963 and thereafter a draft

of the proxy statement to the stockholders of both corporations for approval of the merger was filed with the S.E.C. on July 19, 1963. Final approval was obtained and copies were mailed to the shareholders of each corporation by their respective officers on September 11, 1963, with the intention that they should rely on the statements of fact therein contained.

In a July 12, 1963 letter sent by Becker to the various holders of Skogmo's 6% Notes, seeking an amendment of the Notes, Becker stated that it was contemplated that Skogmo might from time to time sell additional advertising plant branches of GOA, Inc., a new wholly-owned subsidiary of General, to which the plants would be transferred on the eve of the merger, recovering the investment therein plus a profit. Becker suggested that the amendment to the Notes was important since they expected to be able to bring funds generated especially out of the profits realized in GOA, Inc. into Skogmo "by the retirement of capital notes".

*Merger*

To facilitate the consummation of the proposed merger, General transferred on October 7, 1963, immediately prior to the stockholders' meetings, all of its assets except 250,000 shares of Allegheny stock, to a new corporation incorporated in Nevada under the name of General Outdoor Advertising Company, Inc. (GOA).

The stockholders of General held a meeting on October 11, 1963 and approved (i) an amendment to its certificate of incorporation by expanding its objects and purposes by adding thereto the same objects and purposes stated in paragraphs A and B of Article THIRD of Skogmo's certificate of incorporation, and (ii) the agreement of merger between General and Skogmo. The stockholders of Skogmo held a meeting on October 15, 1963 and approved (i) an amendment to its certificate of incorporation by expanding its objects and purposes by adding thereto those objects stated in five new paragraphs, being the same objects as stated in paragraphs 1 through 5 of Article THIRD of General's certificate of incorporation, and (ii) the agreement of merger between General and Skogmo.

The votes on the two proposals at each meeting were separate and the stockholders of both corporations were advised in the proxy statement that if the stockholders of one or both of the corporations did not approve the merger as required by law, or if the Board of Directors of either corporation should determine as provided in the agreement of merger that the merger should not be made effective for any other reason, then the Board of Directors of each corporation would not make the proposed amendments to the respective certificates of incorporation effective, notwithstanding the requisite approval of such amendments at the respective stockholders' meetings. The amendments to the certificate of incorporation of General were made effective on October 14, 1963 (a day before the Skogmo meeting), and the amendments to the certificate of incorporation of Skogmo were made effective on October 16, 1963, in each case by completing the necessary statutory filings.

The agreement of merger provided in Article XIII that each Board of Directors reserve the right, in its discretion, to refrain from making the merger effective notwithstanding the stockholders' approval of each of the constituent corporations, for any reason which should make it inadvisable or inexpedient, in the opinion of such Board of Directors, including, among other things, number of dissents, material adverse changes in the financial conditions of either or both of the constituent corporations, and inability to obtain satisfactory tax rulings relative to the consequences of the merger.

On October 17, 1963, two days after the Skogmo meeting, the agreement of merger was filed in the offices of the Secretaries of the States of Delaware and New Jersey, upon which date the merger became effective.

## IV

## PLANT SALES AFTER THE MERGER

Sales of the branches were brisk after the merger. In the late summer and fall of 1963, prior to the merger, Ryan met with prospective purchasers, including many who purchased subsequently, and informed them that General would probably be willing to sell plants immediately after the merger. In other words, he kept the offers warm. Within nine months after the merger, Skogmo, as the surviving corporation, had sold all of its remaining domestic outdoor advertising plants and its Mexican operation for a gross purchase price of approximately $25,000,000—about $14,000,000 more than the book value of the assets. Two of the sales were cash sales aggregating $14,116,121 and the remainder were sales involving $2,370,000 in cash and $8,-595,000 in deferred note payments maturing between 1964 and 1972.

### Chicago and New York

The first agreement to sell after the merger was made by telephone between Donald Ryan and John W. Kluge, president of Metromedia, on October 18, 1963, one day after the date of the merger, and involved the sale of the New York and Chicago plants to Metromedia for approximately $13,551,121 in cash. These two plants represented over one-half of the remaining domestic outdoor advertising properties formerly owned by General and the purchase price exceeded the book value by $7,645,779. Kluge had informed Ryan from Spring, 1962 to October, 1963, that he desired to buy Chicago but he knew that other people were also interested in this plant. Metromedia, a broadcasting concern, had entered the outdoor advertising business in 1960 and had received from General, late in 1962, eight of its 8-year earning projections and selling price computations, identified above, including the projections for Chicago and New York. Consequently, Kluge knew of General's willingness and desire to sell some of its advertising plants. Early in 1963 Kluge

received updated 1957–1962 financial data on the Chicago plant, and on or about September 11, 1963, Metromedia prepared an office memorandum on "Proposed Financing", which included certain data concerning General's Chicago outdoor advertising plant which apparently was under consideration for acquisition at a cost of $10,000,000. It was carried on a pro forma balance sheet as $9,000,000 for tangibles and $1,000,000 for intangibles.

On October 9, 1963, Metromedia received from General updated 6-year statements of operations of both the Chicago branch and the New York branch. On or about October 9, 1963, Kluge and Ryan had a dinner meeting in New York at which Kluge again discussed his interest in purchasing Chicago. Ryan told Kluge that he could not negotiate until a meeting of some kind (not explained) occurred, but that Kluge should be prepared to put up cash after that event. Ryan also claimed there was some general discussion of plant prices. Kluge said he did not mention New York to Ryan at the dinner meeting or to Metromedia's treasurer prior to October 18, 1963, which was the time he talked with Ryan on the telephone and made a quick switch by making a package offer for both New York and Chicago, thus sweetening his original offer for Chicago. Ryan, however, maintained that the dinner discussions with Kluge included New York as well as Chicago. The court believes Ryan's version of the facts.

Ryan is substantiated by the fact that on October 10, 1963, the treasurer of Metromedia and a member of Kuhn, Loeb & Co. representing Metromedia, discussed with the Bank of New York the possibility of funding Metromedia's then existing bank loan and opening an additional revolving credit. In connection with this discussion the bank official understood that Metromedia contemplated the purchase of General's Chicago branch for $10,000,000 and its New York branch for $5,000,000.

At all events, by October 28, 1963, the final terms for the purchase by Metromedia of the Chicago and New York plants were closed and the price expressed as ultimately paid was $13,500,000. In addition to the $13,500,000 paid for tangible property, $1,500,000 was paid for accounts receivable and prepaid items. The purchase price for the plants exceeded the book value of $5,905,342 by $7,504,802.

Once the New York plant was sold, there was no longer any need to retain the remaining plants as possible sweeteners for the sale of any other plant and Gesme and Rachie so testified and indicated that from then on it was inadvisable to keep any of the remaining properties. Then ensued a relatively quick disposition of branches in the following sequence:

*Philadelphia, Washington and Mexico*

In February, 1963, General sent to Allan Kander Associates, Inc., a business broker which had represented Rollins Broadcasting, Inc. in business transactions with General, a 5-year statement of operations and assumptions and 8-year projections of earnings of the Washington plant. On March 5, 1963, Kander, on behalf of Rollins, offered by letter to negotiate for all the unsold plants of General on a cash basis except certain parts of the New York plant. While an appointment was made for Ryan and Rollins for late March, it was postponed until May, 1963 and never held. On March 5, 1963, Rollins also offered General $4,000,000 for the Philadelphia and Harrisburg outdoor advertising plants, which was rejected. In the summer and fall of 1963 Rollins discussed with Don Ryan the possible acquisition of the Philadelphia and Washington plants. After a visit by Rollins to General's Chicago office, General sent Rollins on November 1, 1963 updated figures for the Washington branch for the nine months ended September 30, 1963, and on November 8, 1963 updated figures for Binghamton, Harrisburg, Philadelphia, Utica and Washington.

On November 14, 1963, Rollins made a proposal to buy the Philadelphia and Washington plants for $5,300,000, which, on November 22, 1963, resulted in a preliminary agreement between the parties and was followed by a formal agreement on December 2, 1963, the closing being on March 2, 1964. The gross sales price was $5,300,000, which exceeded the book value of $1,965,263 by $3,334,737, payable as follows: $50,000 on November 14, 1963, $200,000 on the signing of the formal contract on December 2, 1963, and the remainder at the closing: $1,250,000 in cash and $3,800,000 in notes (made by Continental Broadcasting, Inc. and guaranteed by Rollins) payable in eight installments of $475,000 each due March 2d of each year from 1965 through 1972.

In March, 1963, General supplied Rollins, through Kander, figures covering General's Mexican subsidiary, including working capital requirements for the company. On October 28, 1963, Rollins made a proposal to buy the Mexican subsidiary for $500,000 and entered into a formal contract for the same on November 18, 1963, the closing taking place on December 10, 1963. At the closing Rollins paid only $475,000, $120,000 in cash and $355,000 in notes payable in five equal annual installments. The sale was $173,000 less than the book value of $648,000 for the plant.

*Hartford*

Next in point of time was the sale of the Hartford plant, which was sold on November 30, 1963 for $900,000, being $719,357 in excess of the book value. The offer was originally made on November 1st or 2d, 1963, by one Brown Bolte, which constituted a revision of an earlier offer submitted on March 14, 1963. Bolte's interest in Hartford, as well as in Binghamton and Utica, related

back to 1962, which Bolte described as intense. Bolte delayed his offer for Hartford in the fall of 1963, until he was able to find a manager.

*Minneapolis*

Minneapolis was sold on December 27, 1963 to Naegele Outdoor Advertising, Inc. for $2,500,000, excluding the "Home Office", the purchase price exceeding the book value of the plant by approximately $1,650,000. An oral offer for the plant was made and accepted some time between October 25th and December 1st, 1963.

*Harrisburg*

This plant was agreed to be sold on November 13, 1963 and the sale was effectuated on January 13, 1964 to Arthur A. Porter for $790,000, approximately $650,000 above the book value. F.K.M. Advertising Corporation had been interested in Harrisburg as early as October, 1962, but was advised by General that sales had been suspended. It made a further inquiry in November, 1963, stating that it wished to make a bid, but was given an evasive answer.

*South Bend*

South Bend was sold to Charles B. Burkhardt on November 12, 1963 for $565,000 in cash, approximately $250,000 above the book value. He was interested in the South Bend plant as far back as September, 1962, as a possible model plant for demonstration purposes.

*Binghamton and Utica*

Both of these plants were sold to Roy H. Park on July 10, 1964 for $1,000,000, which was approximately $500,000 in excess of the book value. Park had offered this amount for these plants as early as November 18, 1963. The sale to Park for $1,125,000 was approved by General's executive committee in December, 1963, but apparently this sum was unacceptable to him. His interest in these plants related back to August, 1962, when Ryan quoted a package price of $1,250,000 for the two plants plus Hartford. Park was still negotiating with General for the Binghamton and Utica plants on January 4, 1963.

A summary table of the post-merger sales is as follows:

| Branch | Contract Date | Book Value | Selling Price |
|---|---|---|---|
| Chicago | 10/31/63 | | |
| New York | 11/ 1/63 | $ 5,905,342 | $13,551,121 |
| Westchester | 6/ 3/64 | | |
| Hartford | 11/30/63 | 180,643 | 900,000 |
| Vendor, S. A. | 11/25/63 | 648,000 | 475,000 |
| Minneapolis | 12/23/63 | 844,209 | 2,500,000 |
| Harrisburg | 1/13/64 | 240,826 | 790,000 |
| South Bend | 1/30/64 | 312,829 | 565,000 |
| Philadelphia and Washington | 12/ 2/63 | 1,965,263 | 5,300,000 |
| Binghamton and Utica | 7/13/64 | 479,306 | 1,000,000 |
| Total Plants | | $10,576,418 | $25,081,121 |
| Excess of Sales Price Over Book Value | | | $14,504,703 |

The total amount of sales of all plants as of the date of the merger was $33,132,260.72, of which $5,547,506.07 was in cash and $27,584,754.65 was in notes, the unpaid balance upon which on that date was $25,336,098.88. The total amount of sales for all plants subsequent to the date of the merger was $25,081,121, of which $16,486,121 was in cash and $8,595,000 in notes. The total amount of all sales of plants was $58,213,381.72, of which $22,033,627.07 was in cash and $36,179,754.65 in notes. Although payment of some notes was extended, none of said notes were in default. The amount of each note and the uncollected balance appear from the following table:

| Plant 1962 | Date of Sale | Original Amount of Notes | Uncollected Balance as of Oct. 17, 1963 or when issued |
|---|---|---|---|
| St. Louis | 3/ 1/62 | $ 2,300,000.00 | $ 2,053,000.00 |
| Louisville | 6/30/62 | 1,325,000.00 | 1,262,500.00 |
| New Orleans | 7/31/62 | 1,465,861.40 | 1,282,609.60 |
| Davenport | 8/24/62 | 216,677.25 | 184,176.82 |
| Cedar Rapids, Sioux City and Sioux Falls | 6/27/62 | 643,500.00 | 523,133.31 |
| Peoria | 8/22/62 | 376,000.00 | 329,000.00 |
| Atlanta, Richmond, Roanoke | 9/ 6/62 | 3,341,339.00 | 2,513,754.68 |
| Nashville | 9/ 7/62 | 658,661.00 | 440,274.12 |
| Memphis | 8/27/62 | 1,312,715.00 | 1,127,650.35 |
| Dayton | 12/19/62 | 780,000.00 | 780,000.00 |
| Akron, Indianapolis, Youngstown | 12/19/62 | 3,440,000.00 | 3,440,000.00 |
| Denver, Duluth, Omaha | 12/20/62 | 4,725,000.00 | 4,525,000.00 |
| Asheville, Kinston, Raleigh Winston-Salem and Jacksonville | 12/19/62 | 4,000,000.00 | 4,000,000.00 |
| TOTAL – 1962 | | $24,584,754.65 | $22,461,098.88 |
| 1963 – Prior to Merger | | | |
| Kansas City* | 2/20/63 | $ 2,000,000.00 | $ 1,875,000.00 |
| Oklahoma City | 5/31/63 | 1,000,000.00 | 1,000,000.00 |
| TOTAL – 1963 – Prior to Merger | | $3,000,000.00 | $ 2,875,000.00 |
| Sales Subsequent to Oct. 17, 1963 | | | |
| Chicago, New York, Westchester** | 11/ 1/63 6/ 3/64 | – | – |
| Hartford | 11/30/63 | $ 675,000.00 | $ 675,000.00 |
| Vendor, S. A.*** | 11/25/63 | 355,000.00 | 355,000.00 |
| Minneapolis | 12/23/63 | 2,425,000.00 | 2,425,000.00 |

| Plant 1962 | Date of Sale | Original Amount of Notes | Uncollected Balance as of Oct. 17, 1963 or when issued |
|---|---|---|---|
| Sales Subsequent to Oct. 17, 1963 | | | |
| Harrisburg | 1/13/64 | 590,000.00 | 590,000.00 |
| South Bend** | 1/30/64 | -- | -- |
| Philadelphia and Washington**** | 12/ 2/63 | 3,800,000.00 | 3,800,000.00 |
| Binghamton and Utica | 7/13/64 | 750,000.00 | 750,000.00 |
| TOTAL--Subsequent to Oct. 17, 1963 | | $ 8,595,000.00 | $ 8,595,000.00 |
| TOTAL ALL PLANTS | | $36,179,754.65 | $33,931,098.88 |

\* Paid in full by 1/31/65.

\*\* All cash.

\*\*\* Paid in full by 1/1/65.

\*\*\*\* Paid in full by 1/1/65.

———◆———

V

LEGALITY OF MERGER

Plaintiffs allege that the merger of the two corporations violates Section 14:12–1 of the New Jersey General Corporation Law permitting the merger only of corporations organized to carry on "any kind of business of the same or a similar nature". The charge is based upon the fact (i) that the charter amendments in this case were not filed before the merger vote was taken, and (ii) that the authorization for the charter amendments were subject to certain conditions. This same claim was raised upon the motion for summary judgment. Judge Dooling in a thorough and analytical opinion decided that the objections were technical and did not affect the validity of the meetings or the action taken thereat. This conclusion is adopted.

Both General's and Skogmo's stockholders voted to amend their charters for the purpose of carrying on business of "the same or a similar nature", General's on October 11, 1963, and Skogmo's on October 15, 1963. General's amendment was made effective by filing on October 14, 1963, and Skogmo's was made effective by filing on October 16, 1963. At the same meetings the stockholders of both General and Skogmo, respectively, voted to approve the agreement of merger. The votes on the two proposals were separate and distinct in each case, although at the same meeting. General's amendment was made effective before Skogmo's stockholders' meeting. The stockholders of General were advised that if they did not approve the merger or if the Board of Directors of either company decided not to make the merger effective, then the amendment would not be effectuated even if approved. The stockholders of Skogmo were advised that if the stockholders of either General or Skogmo failed to approve the merger or if the Board of Directors of either company decided not to make the merger effective, then the amendment would not be effectuated even if approved.

The practice of amending charters in New Jersey in anticipation of merger is of long standing and there is

no policy considerations or conflict in legislative goals requiring more than a literal compliance with the statute. Brundage v. New Jersey Zinc Company, 48 N.J. 450, 226 A.2d 585 (1967); Clarke v. Gold Dust Corporation, 106 F.2d 598, 602 (3d Cir. 1939), cert. denied, 309 U.S. 671, 60 S.Ct. 614, 84 L.Ed. 1017 (1939). But the charter amendment must be separate and cannot be the creation of the merger and consequently cannot "be made either in concert with, or as a sequence of, the completed merger". Imperial Trust Company v. Magazine Repeating Razor Co., 138 N.J.Eq. 20, 46 A.2d 449 (Ch. 1946). As indicated by the statute, stockholders must be afforded an opportunity to vote directly upon the question of charter amendment and the act cannot be evaded or circumvented by vote by a merger agreement which in itself purports to change the corporate objects. Colgate v. United States Leather Co., 75 N.J.Eq. 229, 72 A. 126 (E. & A. 1909). In Outwater v. Public Service Corporation, 103 N.J.Eq. 461, 143 A. 729 (Ch. 1928), affirmed, 104 N.J.Eq. 490, 146 A. 916 (E. & A. 1929), after a bill to enjoin the merger raised a question of dissimilarity of purposes, the charters of the merging companies were amended to make their objects identical. Thereafter a duplicate merger agreement was approved by the stockholders and although both events occurred *pendente lite*, the court approved the merger. In *Brundage, supra*, although the shareholders voted at the same meeting to approve the amendments and the merger agreement, the meeting was adjourned to permit the filing of the amendments and thereafter reconvened twenty days later to approve the merger. In *Clarke, supra*, the amendments were first filed and the merger vote taken thereafter.

While there seems to be no reported decision in New Jersey upon the particular procedure followed in this case, the court must rely upon the guidelines gleaned from the interpretations placed upon the statute by the New Jersey authorities. From these the court concludes that inasmuch as the amendments were voted on separately and actually made effective before the merger agreement was filed, there was a literal compliance with the statutes. Although the procedures differ from those in the *Clarke* and *Outwater* cases, the conditions attached to the authorizations for filing the amendments were satisfied before the merger and hence did not fall within the procedures condemned in *Colgate* and *Imperial*.

## VI

### ALLEGED $6,000,000 TAX LOSS

Among the many offenses charged, the complaint contains an allegation that between June and October, 1962, Skogmo sold outdoor advertising properties of General at substantial profits, causing General to pay approximately $6,000,000 in taxes which could have been avoided had Skogmo caused General to liquidate and distribute its assets within one year for the benefit of its shareholders tax free pursuant to a plan of complete liquidation authorized by Section 337 of the 1954 Internal Revenue Code. This claim is meretricious. In order to obtain the tax free benefit of the section, it would have been necessary for Skogmo to cause General to sell all its properties and distribute the proceeds to all the stockholders within one year. A majority stockholder is not required against his will to liquidate and distribute the assets of the corporation for the benefit of all the stockholders including the minority, if acting in good faith he has reason to believe that an orderly sale of the properties and the diversified investment of the proceeds would offer a more profitable future for the enterprise. Moreover, there has been no showing that all of General's outdoor assets could have been sold at fair prices within one year and the proceeds distributed within the same year as required by Section 337 of the Code.

VII

## PROXY STATEMENT

For the purpose of obtaining votes in favor of the merger, a proxy statement, dated September 11, 1963, was mailed to the shareholders of each company. This document, in its narrative portion, contained the proposals to be acted upon, the recommendations of the Boards of Directors of the respective companies, a Description of Skogmo's Preferred Stock to be issued to General's stockholders, History, Business and Property of Skogmo, Recent Store Developments and other pertinent matters. The terms of the exchange were set forth together with a statement that in Becker's opinion the plan was fair to stockholders of both companies. There were annexed to the proxy statement, among other financial statements, Pro Forma Condensed Balance Sheet of Skogmo and General and Balance Sheet and Earnings Statements of Skogmo and Consolidated Subsidiaries and Balance Sheet of General and Consolidated Subsidiaries. The Statement of Income of General and Consolidated Subsidiaries appeared in the textual portion of the proxy statement. In the balance sheet attached to the proxy statement, General carried its property, plant and equipment at cost, which was $20,119,690. Nothing was said in the textual portion of the proxy statement concerning asking prices or offers to purchase or the appraisals above outlined. The statement did announce that "the price obtained for the St. Louis branch, as well as the prices at which other outdoor advertising operations were then being bought and sold, demonstrated that the market value of a substantial portion of the company's plants was considerably in excess of book value" and further, with respect to real estate parcels, that "Based on appraisals and on the prices obtained by General Outdoor during 1962 and 1963 on sales of similar real estate, General Outdoor believes that on May 31,

1963, the foregoing approximately 220 parcels of real estate had a value, when sold in connection with other outdoor advertising facilities in the same area, of approximately $3,700,000 or $839,127 in excess of the book value of $2,860,873 as of the same date." In the Notes to the Financial Statements of Skogmo, mention was made of the fact that the excess carrying value of Skogmo's investment in General's stock was allocated to individual branches in proportion to the sum of "(i) the excess of sales prices over net book values of branches sold, and (ii) the excess of realizable values, as appraised by management, over net book values of the remaining branches." [6] In the same Notes it was pointed out that "In July, 1963 it was decided to amortize the portion (of excess carrying value) applicable to operating branches sold and to carry the balance applicable to the remaining branches until such time as there is evidence of impairment of the carrying value ascribed to such branches." The proxy statement was signed by both Skogmo and General.

### Failure to State Appraised Value of Remaining Branches

While it was realized in the balance sheet notes of the Gamble-Skogmo consolidated statement that there was an "excess of realizable values, as appraised by management, over net book values of the remaining branches", the amount of this excess was not set forth in either the notes or the textual statement of the proxy material and is one of the grounds of the complaint. This becomes particularly pertinent because the merger plan provided that General's stockholders would receive Skogmo preferred stock having a market value approximately equal to only the book value of General stock. As a matter of fact, after the proxy statement was disseminated, there was discussed with the Commission, in the presence of Skogmo's representatives, the failure of the proxy statement to

6. The balance sheet was prepared on a going-concern basis and is hardly the proper place to find liquidating values.

See Rule 1–01(a) of Regulation S–X, 17 CFR 210.1–01(a).

disclose the fair market value of General's assets. It was not stated at that time that the assets were to be sold. The Commission advised that it was contrary to its policy to have "that kind of prospective information" included and that it was accordingly impermissible.

Accordingly, at the request of the Court, the Commission filed a brief as *amicus curiae.* In this brief it asserted, among other things, that in the financial statements attached to the proxy material, fixed assets must be carried at historical cost less depreciation provided that available material information about current liquidating value necessary to make the proxy statement not misleading must also be stated in the textual or narrative portion thereof when the balance sheet reflects assets in amounts substantially lower than the current liquidating value and liquidation is intended or can reasonably be anticipated. It pointed out that good faith offers to buy assets for more than the book value must be disclosed if the omission would render the proxy statement materially misleading and that existing appraisals of current liquidating value of assets must also be disclosed if made by qualified experts and have sufficient basis in fact. On the other hand, the Commission advised that the corporation's own asking price for its property may not be disclosed.

█ Under the circumstances it appears that there were appraisals over net book values made by General and Skogmo for the remaining properties for some of which the management of General received offers. The officers of Skogmo and General were in a unique position. They had experience in the industry and with prior sales of 23 of the other plants behind them, were amply qualified to make reliable appraisals. This is substantiated by the fact that excluding the sale of the Mexican plant, the actual post-merger sale prices of all the plants were only 3% less than Dolan's November, 1962 appraised values and only 12% less than Gesme's March, 1963 appraised values. Such appraisals plus the offers

for Philadelphia, Harrisburg and Hartford should have been stated in the narrated portion of the proxy statement. The disclosures in the proxy statement were not sufficient to properly inform the stockholders of the concealed values of the remaining unsold advertising plants. The omission made the proxy statement materially misleading.

*Statement of Skogmo as the Surviving Corporation to Continue General's Outdoor Advertising Business.*

█ General's balance sheet attached to the proxy statement was prepared on a going-concern basis. If there was no intent to continue its outdoor advertising business, then there was a duty on the part of General and Skogmo to so state in the textual portion of the proxy material. The statement in the proxy material which purportedly covers the subject, reads as follows:

"If the merger becomes effective, it is the intention of Gamble-Skogmo, as the surviving corporation, to continue the business of General Outdoor, including the policy of considering offers for the sale to acceptable prospective purchasers of outdoor advertising branches or subsidiaries of General Outdoor with the proceeds of any such sales, to the extent immediately available, being used to further expand and diversify operations now being conducted or which might be acquired and conducted by Gamble-Skogmo or its new, wholly-owned subsidiary, GOA, Inc. There have been expressions of interest in acquiring many of the remaining branches of General Outdoor and discussions have taken place in connection therewith, but at the present time there are no agreements, arrangements or understandings with respect to the sale of any branch and no negotiations are presently being conducted with respect to the sale of any branch."

The above assertion has been critically attacked. The statement did say that Skogmo would continue "the policy of considering offers for the sale to accept-

able prospective purchasers of outdoor advertising branches or subsidiaries of General Outdoor * * * ". Plaintiffs argue that this statement was insufficient to express the true intention of Skogmo to discontinue General's outdoor advertising business and to sell the remaining plants immediately after the merger at purchase prices substantially in excess of the book value. In other words, it was false to state that Skogmo intended "to continue the business of General Outdoor". Plaintiffs also contend that the statement that there were expressions of interest and discussions involving the sale of the remaining plants was misleading because it failed to disclose that acceptance of offers and discussions relating thereto were intentionally delayed until after the merger. To this plaintiffs add the further charge that Skogmo had no policy of considering offers for the sale of its branches between October, 1962 and October 17, 1963, except for a brief period in December, 1962, and that Skogmo's statement to the contrary was false and induced stockholders to believe that the absence of sales in 1963 was due to the absence of offers, which was not true.

## VIII

### SKOGMO'S INTENT TO SELL

 The intentions of the defendant may be determined by the inferences to be drawn from the acts of its officers and the chain of events resulting therefrom. "Defendants further claim that they acted in good faith and are innocent of any wrongdoing and that there was no evidence of any intent to defraud on their part. The intentions of the defendants are properly inferable from their acts and may be shown proven by circumstantial as well as direct evidence." Texas Continental Life Insurance Company v. Dunne, 307 F.2d 242, 249 (6th Cir. 1962). Skogmo was a majority stockholder of General and through this relationship controlled General. There are a number of facts that support this conclusion. B. C. Gamble, president of Skogmo, first employed Donald Ryan as executive vice-president of General without consultation with General's Board of Directors. He placed not only Ryan but also Gesme, Rachie and Younger on the Board of General, and in addition, was able to cause General to purchase and then sell Channing and thereafter to purchase Allegheny and Stedman. Skogmo was also the dominant factor in making the banking arrangements for General for the purchase by the banks of the 8-year Notes received by General from the sale of its properties. In its controlling position Skogmo, for all practical purposes, dictated the policy of selling General's outdoor advertising plants during 1962 and 1963. Ryan, under the aegis of Skogmo, never ceased his activities in soliciting and warming up offers for General's outdoor advertising plants, although some of the non-Skogmo directors such as Cushman Bissel (who acted independently), were not kept advised of Ryan's activities. Skogmo, with the help of Becker, initiated the merger proceeding.

 The history of corporate wheeling and dealing by General after Skogmo obtained control demonstrated that Skogmo as the controlling stockholder and surviving corporation intended at least by and probably before July 19, 1963, to sell all the remaining outdoor advertising plants of General immediately after the merger. Any other conclusion would contradict the economic necessities of General's business condition, the trend of events and B. C. Gamble's philosophy of "corporate mobility". The intention to sell appears as an inescapable inference from the following facts: (i) General's earnings produced a mere 3% return on the estimated value of its outdoor advertising assets; (ii) after the sale of the St. Louis branch in early 1962, exceedingly high purchase prices were offered for outdoor advertising plants; (iii) the preparation in March, 1962 of the "Green Book," a reference book, showing the valuation of each branch substantially in excess of the cost; (iv) the adoption in July, 1962 by Bertin C. Gamble of the philosophy

of "corporate mobility", meaning the sale of General's plants not earning a sufficient return and diversification by new investments; (v) the dismal appraisal of the outdoor advertising prospects of General by Ryan in June and July, 1962; (vi) the circulation by Ryan of historical earnings, projections and values on all plants to prospective purchasers from time to time between August, 1962 to the date of merger; (vii) agreements entered into by General in November and December, 1962, with The First National Bank of Chicago syndicate for the ultimate sale of a maximum of $55,000,000 of General's notes, at a time when General had received only $24,584,-754 in plant notes; (viii) the sale by General by the end of 1962 of 7 of the 11 plants which Burr Robbins considered as top earners and necessary to form an operating nucleus, and General's willingness to sell Philadelphia, Washington and/or Chicago in a package deal with New York; (ix) statements to Walter Davies contained in Paul Judy's analysis of March 11, 1963, to the effect that upon an exchange of Skogmo stock for General stock on a share-for-share basis "Gamble would pick up approximately $37 in book value per Gamble share issued, such book value being approximately $13 under estimated final liquidation value per share"; (x) the purchase of advertising plants by Robbins on his own account in April, 1963, suggesting the discontinuance of this business by General; (xi) the poor operating figures of General in the summer of 1963, causing Robbins to remark that "they made you sick to your stomach" ; (xii) Skogmo's knowledge at the time the proxy statement was prepared of the existence of many prospective purchasers for all the remaining plants, with the exception of Claude Neon and possibly New York, at gross sales prices far in excess of the book value; (xiii) the expressions of serious interest before the merger by the purchasers after the merger of all the remaining plants; (xiv) the immediate sale after the merger of New York and Chicago to Metromedia, and the discussions between the parties with respect thereto immediately prior to the merger; and (xv) negotiation efforts between Rollins Broadcasting Company and General from April, 1963 to the merger date, which resulted in completed agreements immediately after the merger on December 2, 1963.

> "There is no general rule for determining what facts will constitute fraud, but it is to be found or not according to the special facts of each particular case. It is rarely susceptible of direct proof, but must ordinarily be established by circumstantial evidence and legitimate inferences arising therefrom, which, taken as a whole, will show the fraudulent intent or purpose with which the party acted. The inferences to be gathered from a chain of circumstances depend largely upon the common sense knowledge of the motives and intentions of men in like circumstances." Connolly v. Gishwiller, 162 F.2d 428, 433 (7th Cir. 1947), cert. denied, 332 U.S. 825, 68 S. Ct. 166, 92 L.Ed. 400 (1947).

Skogmo's concealment of its intent to sell made the statement that it intended "to continue the business of General Outdoor" false and misleading. The assertion to the effect that General had in 1962 and 1963 sold 23 of its 36 United States outdoor advertising branches at a profit of $14,184,368 and that Skogmo would continue "the policy of considering offers for the sale to acceptable prospective purchasers" was entirely inadequate to disclose the inside information possessed and withheld by Skogmo. Skogmo claims that it had no intent to sell Claude Neon or Stedman and that both of these companies were included in the business of General and that consequently its statement that it intended "to continue the business of General Outdoor" was true. Claude Neon and Stedman represented less than half of General's business and in the proxy statement Stedman was not included under the category of the history of General's business because General's business in reality was outdoor advertising.

A half truth is often more misleading than a statement that is wholly false.

 Plaintiffs charge that Skogmo had a duty to insert in the proxy material a clarifying statement that "the policy of considering offers for the sale" of outdoor advertising branches had been suspended for various reasons during 1963, raises a borderline question. They claim that without this explanation stockholders received the false impression that the failure of General to make such sales in 1963 was due to the fact that no offers were forthcoming. Under the anti-fraud provisions of the Federal Securities Acts, stockholders must be fully and completely informed. Under these provisions there is no room for technical explanations and tight-lipped announcements and all doubt arising from ambiguous statements must be resolved in favor of the stockholders. However, one cannot say as a fact that the absence of a statement of suspension of the policy of sales in the proxy material led stockholders to believe that no offers were available because there are other inferences possible and in all events the omission per se was not material. There is no necessity and in fact it is quite impracticable to clutter up the proxy statement with explanations or facts as anticipatory defenses to any and all possible stockholders' claims, however unreasonable they may be. See Richland v. Crandall, 262 F.Supp. 538 (S.D.N.Y.1967). The Court concludes that there was no evidence showing that this omission caused any other statement in the proxy material to be misleading.

*Becker's Role*

 Plaintiffs complain that A. G. Becker & Co. should never have been designated to pass upon the fairness of the merger plan and that it acted improperly in announcing that the plan of merger was fair. In the past Becker had rendered certain investment banking services to Skogmo and consequently was closer to Skogmo than to General. A person who attempts to express a public opinion on the fairness of a transaction such as a merger plan to be acted upon by stockholders having two divergent interests, should be in a position of absolute impartiality. Prior business relationships by the arbiter with one or the other party raises a question whether he can be completely impartial. There is no finding that Becker, in rendering judgment as to the fairness of the plan, did not act in good faith or was improperly motivated. Becker, however, should not have been chosen by the Boards of Directors of the two companies for this purpose and when chosen, should have rejected the appointment. As it turned out, Becker's valuation of General's stock, in determining the fairness of the plan, was premised upon stock market prices of a going concern rather than upon an appraisal of liquidating values of the properties and consequently the valuation was definitely erroneous. Too much emphasis was placed upon the price-earnings multiple and not sufficient consideration attributed to liquidating values. While there was no evidence that Becker knew that General's remaining properties would be sold and the outdoor advertising business discontinued, there was sufficient evidence to suggest to Becker that probability. In other words, Becker's lenses were blurred. In view of other more substantial claims, no purpose is served in attempting to fix liability upon Skogmo by reason of Becker's selection, and this complaint will be dismissed.

### IX

VIOLATIONS OF § 17(a) OF THE 1933 ACT AND §§ 10(b) AND 14(a) OF THE 1934 ACT AND RULES 10b-5 AND 14a-9 ISSUED THEREUNDER, AND BREACH OF TRUST

 A violation of the sections and rules of the 1933 and 1934 Acts above enumerated is alleged by plaintiffs. Each of these provisions, while containing variations, overlap in a number of instances, but all represent the Congressional effort and purpose to protect the public from fraud in all types of secur-

ity transactions. Sections 17(a) and 12(2) of the 1933 Act are aimed at fraud resulting from misrepresentations by a seller to a buyer in the sales of securities, while Section 10(b) and Rule 10b–5 [7] are directed against such fraud in both sales and purchases of securities. Section 14(a) and Rule 14a–9,[8] on the other hand, are limited to misrepresentations made in the proxy material or in a statement addressed to a body of stockholders. Although the language of Rule 14a–9 parallels closely the language of Rule 10b–5 and the precedents under Rule 10b–5 are in most cases applicable, violations of Rule 14a–9 are not limited by those precedents. In this case plaintiffs seek a remedy primarily as sellers of General's stock to Skogmo and consequently Sections 17(a) and 12(2) of the 1933 Act are inapplicable or at least unnecessary to invoke. *Cf.*, Richland v. Crandall, *supra*; Barnett v. Anaconda Company, 238 F.Supp. 766 (S.D.N.Y. 1965). While the facts of the case also come within the purview of Rule 10b–5, since a merger is deemed to include a sale (see, Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); Securities and Exchange Comm. v. National Securities, Inc., 89 S.Ct. 564, January 27, 1969), Rule 14a–9, in view of its special purpose, is obviously more pertinent and is unhampered by the traditional anti-fraud principles which in a diluted form are still relied upon under Rule 10b–5.

Section 14(a) was enacted and Rule 14a–9 specifically adopted to protect the vote of stockholders meeting together as a body and acting as a unit, from fraud and misrepresentation. The action of the group or body is sought to be protected and not the individual action of each stockholder casting a vote while acting simultaneously with other stockholders. The proxy rules have become a medium of upgrading and requiring full disclosure of material facts in anticipation of any stockholders' meeting to enable the stockholders to make informed decisions in their capacity as voters. They are given a unique protection from fraud. Each stockholder has a right to insist that neither he nor his fellow-stockholders be deceived when acting as a body in casting their vote. A stockholder, although he himself may not have been misled or deceived, may nevertheless bring an action under Rule 14a–9 on behalf of the stockholders who as a body were or may have been deceived by misinformation or failure to disclose in the proxy statement. J. I. Case Company v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Dann v. Studebaker-Packard Corporation, 288 F.2d 201 (6th Cir. 1961).

7. Rule 10b–5. Employment of Manipulative and Deceptive Devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

8. Rule 14a–9. False or Misleading Statements.

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*Scienter, Materiality, Reliance and Causation*

Defendant has set up a number of defenses to this action including a charge that plaintiffs have failed to establish scienter, materiality, reliance and causation.

Scienter

 In this Circuit it appears that in a private action some type of scienter as distinguished from mere negligence is still necessary in an action under Rule 10b–5. See, Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951); Weber v. C.M.P. Corporation, 242 F.Supp. 321, 325 (S.D.N.Y. 1965); Securities and Exchange Comm. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968); Securities and Exchange Comm. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); Securities and Exchange Comm. v. Great American Industries, Inc., 407 F.2d 453 (2d Cir. 1968); Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968).[9] For contrary holdings compare Securities and Exchange Comm. v. Van Horn, 371 F.2d 181 (7th Cir. 1966); Drake v. Thor Power Tool Company, 282 F.Supp. 94, 105 (N.D.Ill.E.D. 1967). However, this Circuit has held that under Section 10(b) (5), "the limits of 'fraud' under the securities law are not identical with those of common law deceit—an appropriate standard were this a cash transaction." Securities and Exchange Comm. v. Great American Industries, Inc., supra, at p. 463, (Kaufman, J., concurring). Of the three clauses of Rule 10b–5, only Section 2, refers to false and misleading statements. The other two sections are directed at fraudulent schemes or devices to defraud or acts or practices which operate as frauds. The literal phraseology of Section 2, however, does not of itself require an intent to deceive. The necessity to import an intent to deceive into this Section appears only after a comparison of the remedy provided by Section 2 of Rule 10b–5 with the remedies provided by the 1933 Act. As explained in Weber v. C.M.P. Corporation, supra, if negligence alone is sufficient for Rule 10b–5 relief, then there is little difference between an action under Rule 10b–5 and Section 17(a) of the 1933 Act and an action under Sections 11 and 12(2) of the 1933 Act, which are subject to the short statute of limitation and the requirement of security for costs. Under such interpretation plaintiffs would bring most actions for fraud under Rule 10b–5. Such a construction would attribute to Congress an intent to provide different remedies for the same offense—one affording an easier recovery than the other. However, the basis for incorporating scienter into a Rule 10b–5 action does not exist in a Rule 14a–9 suit. Richland v. Crandall, supra; Union Pacific R. Co. v. Chicago and North Western Ry. Co., 226 F.Supp. 400 (N.D.Ill.E.D.1964). Section 14(a) of the 1934 Act authorizes the Securities and Exchange Commission to proscribe the rules and regulations necessary for the protection of investors, pursuant to which Rule 14a–9 was adopted. A literal reading of Section 14(a) and Rule 14a–9 fails to reveal any requirement for scienter. Negligence alone either in making a misrepresentation or in failing to disclose a material fact in connection with proxy solicitation is sufficient to warrant recovery.

Materiality

 Under both Sections 10(b) and 14(a) of the 1934 Act and the Rules pertinent thereto, the false statement must be material in order to be actionable. "Materiality" has been defined as a fact or omission to which "a reasonable man would attach importance * * * in determining his choice of action in the transaction in question." List v. Fashion Park, Inc., 340 F.2d 457, 22 A.L.R.3d 782 (2d Cir. 1965), cert. denied, 382 U.S.

---

**9.** In an equitable action instituted by the Commission for injunctive relief, all the elements of proof in a private suit for damages are not required. Securities and Exchange Com'n v. Texas Gulf Sulphur Co., *supra.*

811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), reh. denied, 382 U.S. 933, 86 S.Ct. 305, 15 L.Ed.2d 344 (1965). While the standard of materiality may be elusive under certain conditions in contested elections (General Time Corporation v. Talley Industries, Inc., 403 F.2d 159 (2d Cir. 1968)), there is nothing elusive about the materiality of the omissions in the proxy statement circulated among General's stockholders.

Reliance and Causation

 Defendant argues that there has been no direct proof that any of the stockholders personally relied upon false or misleading proxy material and that inasmuch as Skogmo owned 50.1% of General's stock, plaintiffs should be required to establish that at least 17% of the remaining stockholders of General would not have voted for the merger had they known the true facts. If a Section 14(a) violation required stockholders to establish, by direct proof, reliance by a sufficient number of stockholders in casting their vote necessary to validate a causal connection, the burden of proof would be prohibitive in a publicly held corporation. Even in a Rule 10b–5 suit, reliance and causation has been inferred from the totality of circumstances. (Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965)) and in most instances under a common law action of deceit, reliance may be inferred from the circumstances attending the transaction. Ochs v. Woods, 221 N.Y. 335, 338, 117 N.E. 305, 306 (1917); Matter of First Citizens Bank & Trust Company of Utica v. Sherman, 250 App.Div. 339, 294 N.Y.S. 131, 140 (4th Dept. 1937).

 Although the standards of materiality and reliance are distinguishable, it is often difficult to distinguish between reliance and causation and a finding of causation is frequently a necessary inference from a finding of reliance. Causation is a metaphysical concept and its meaning may differ in different contexts and the linkage between causation and result necessary to satisfy the legal concept is not always susceptible of direct proof or mathematical determination. See, R. H. Johnson & Co. v. Securities and Exchange Comm., 198 F.2d 690, 697 (2d Cir. 1952), cert. denied, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952); Hoffman v. Palmer, 129 F.2d 976, 984 (2d Cir. 1942), affirmed, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), reh. denied, 318 U.S. 800, 63 S.Ct. 757, 87 L.Ed. 1163 (1943). In a Section 10(b) and Rule 10b–5 suit not only must the individual plaintiff rely upon the false statement but the facts must be such that a reasonable man would have also relied upon the misrepresentation or failure to disclose. List v. Fashion Park, Inc., *supra;* Restatement, Torts § 546; see also, I. Harper & James, Torts 583–84 (1956). However, in a Section 14(a) and Rule 14a–9 action, if the "reasonable man" test has been satisfied, personal reliance by a sufficient number of stockholders may be inferred from the circumstances and reliance by the individual stockholder is unnecessary. Dann v. Studebaker-Packard Corporation, *supra.* The defendant offered no proof showing absence of either reliance or causation on the part of the stockholders voting for the merger.[10] In all events, the stockholders were deprived of their choice. It is reasonable to conclude that given the choice, the ordinary stockholder with all the facts before him would not have voted for a merger depriving him of a participation in substantial profits realizable upon the sale of the remaining outdoor advertising plants. The stockholders in this case voted in the dark and the Court may and does infer from the totality of circumstances reliance by the requisite number of stockholders and resulting causation predicated upon material misrepresentations in the proxy statement. *Cf.*, Barnett v. Anaconda Company, *su-*

10. Market letters submitted by defendant containing speculations as to General's future activities were irrelevant.

*pra*; Laurenzano v. Einbender, 264 F. Supp. 356 (E.D.N.Y.1966).

▮ Recovery under Section 14(a) and Rule 14a–9 may also be had in a derivative suit for *damages* to the corporation caused by deceit practiced upon the stockholders as a group and again in such a case personal deception and individual reliance is unnecessary and causation may be inferred. *J. I. Case Company v. Borak, supra;* see, Loss, Private Actions Under the Proxy Rules, 73 Harv.L.Rev. 1041, 1059 (1960); Vine v. Beneficial Finance Co., *supra.*

### Breach of Trust

▮ Another charge by plaintiffs is that Skogmo as a majority and dominating stockholder of General, breached its fiduciary obligations to the minority stockholders. A majority stockholder who controls the affairs of a corporation is in the position of a fiduciary in relation to the minority. This is an old axiom, which is concisely stated in the much cited case of Southern Pacific Co. v. Bogert, 250 U.S. 483, 487–488, 39 S.Ct. 533, 535, 63 L.Ed. 1099 (1919), where Mr. Justice Brandeis said:

> "The rule of corporation law and of equity invoked is well settled and has been often applied. The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors. If through that control a sale of the corporate property is made and the property acquired by the majority, the minority may not be excluded from a fair participation in the fruits of the sale."

*Cf.,* Geddes v. Anaconda Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 (1921). Setting forth in strong terms the strict obligations of a trustee here applicable are Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928). In the latter case Judge Cardozo remarked (p. 464, 164 N.E. p. 546):

> "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions."

The liability of the dominating majority stockholder to account in this context does not lie in fraud. Having controlled and dominated General, Skogmo in fact became a fiduciary and, as such, was obligated to share, upon equal terms, the proceeds of the sale of General's remaining outdoor advertising properties. It breached this duty when it failed to disclose in the proxy statement the appraised values of the remaining unsold properties and its intent to sell the same, and when it failed to present a fair plan of merger which valued General's common stock upon a liquidating basis rather than a going-concern basis. See, Young v. Higbee Co., 324 U.S. 204, 212, 65 S.Ct. 594, 89 L.Ed. 890 (1945).

## X

### DEFENSES

*Defense of Fairness of the Plan*

▮ Assuming, *arguendo*, there was a failure to disclose a material fact in the proxy statement, defendant claims that since the plan of merger was fair the plaintiffs suffered no damages. According to this thesis, the value of the securities exchanged by General's stockholders was no greater than the value of the securities they received and for this reason there were no damages and can be no recovery. The difficulty with this position is that it fails to make a distinction between cases where by fraud someone is caused to buy for cash property he would not have bought at that price and which declined in value and where by fraud someone is induced to

sell property he would not have sold at that price, if at all. Janigan v. Taylor, *supra*. When a seller is induced to sell his property by means of a statement which he subsequently learns is false, the fact that the sales price was fair at the time is irrelevant. The seller may thereafter maintain an action in equity for a rescission of the contract and an accounting of the proceeds and the ensuing profits. If the property cannot be returned, the plaintiff is entitled to restitution. Falk v. Hoffman, 233 N.Y. 199, 135 N.E. 243 (1922). Janigan v. Taylor, *supra*, and Kardon v. National Gypsum Co., 73 F.Supp. 798, modified 83 F.Supp. 613 (E.D.Pa.1947), decided under § 10(b), have both held that damage at the time of the sale of the stock is not an element of the cause of action if there has been a violation of the disclosure requirement. In this case the stockholders were defrauded by voting for a merger without vital information withheld by insiders. Consequently they are entitled to restitution. In applying this remedy in a Rule 10b–5 suit, Judge Leahy said in Speed v. Transamerica Corporation, 135 F.Supp. 176, 193 (D.Del.1955), modified 235 F.2d 369 (3d Cir. 1956):

> "In the circumstances, it would, I think, be a curious decision of an appellate court which specified that the damages payable to the defrauded party were to be measured in values at the time of the liquidation when plaintiffs were by the act of defendant deprived of the opportunity to gamble on future prices, and to permit the tortfeasor itself, who deprived them of that right, to take the gamble successfully and to retain the proceeds which resulted from it."

The plaintiffs in this case were prevented from exercising their right to decide whether to gamble and speculate upon the profits to be received from the sale of the remaining properties and to diversify the proceeds and to invest in the future value of the 8-year purchase money mortgage notes. The purpose of § 14(a) was to prevent such frustration of stockholders (H.R.Rep.No.1383, 73d Cong., 2d Sess. 13, 14). The exercise of this right cannot be defeated by the mere promulgation of a fair plan in a merger proceeding. Nor can the remedy of restitution be defeated by such a defense.

Realizing that a different conclusion might be reached by the Court of Appeals, the Court has for the sake of completeness made separate findings, which appear in the appendix to this opinion, to the effect that, as a matter of fact, the terms of the merger were unfair to General's stockholders at the time of the vote on October 17, 1963. The exchange contemplated by the merger was made upon the basis of comparative stock market values of the two stocks. The Court finds this basis erroneous and that the exchange should have been made upon the basis of the liquidating value of General's stock as compared to the market value of Skogmo's stock. The exchange of shares was agreed upon by General's stockholders without full disclosure in the proxy statement of material facts. Had there been such disclosure the dissenting stockholders would nevertheless have had the right under the New Jersey law to challenge the fairness of the plan, thus casting upon the majority the burden of establishing its fairness, regardless of the heavy vote of approval (Outwater v. Public Service Corporation, *supra*) and regardless of their right to an appraisal under the then existing New Jersey statute.[11] "The plan must be free from unfairness before the complainants can be put to their election of joining their associates or taking compensation in lieu." Bingham v. Savings Investment & Trust Co., 101 N.J.Eq. 413, 421, 138 A. 659, 662 (Ch. 1927), affirmed, 102 N.J.Eq. 302, 140 A. 321 (E. & A. 1928). See also, Brundage v. The New Jersey Zinc Company, *supra*.

Where, as here, the return of the parties to status quo ante is not possible, the restitutional basis of re-

11. N.J.S.A. 14:12–7, as amended L.1953, c. 14, p. 113, § 11.

covery is the value of the property at the time the sale was consummated or a higher value at a subsequent time if the value of the property has thereafter fluctuated or additions have been made thereto. Restatement, Restitution, § 151; Myzel v. Fields, 386 F.2d 718, 742 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

*Defense of Innocent Conduct*

 Defendant urges that its innocence, assuming a misrepresentation, limits plaintiffs' recovery to damages at the time of the merger and at that time there were no damages. In both this defense and its prior defense of "fairness of the plan", the defendant has confused this action with the common law action of deceit in which plaintiffs seek only monetary damages. As stated in Securities and Exchange Com'n v. Great American Industries, Inc., *supra*, at p. 463 (I. Kaufman, J., concurring): "In sum, any claim that material facts were withheld in a transaction in connection with the sale or purchase of securities must be scrutinized with care, whether or not there would have been liability at common law for such a deed". It is apparent from the Congressional purpose in enacting Section 14(a) and from the adoption of Rule 14a–9 by the Commission, that scienter is not required in such an action. More than that, restitution does not depend upon the existence of the element of intent to deceive. In its original premise, defendant is in error. Accounting and restitution are available against a tortious but innocent wrongdoer for the value of the property either at the time of the conversion or at a subsequent time except to the extent that its value had been increased by the convertor. Restatement, Restitution, § 154. Defendant assumes that its failure to disclose was innocent in that it was neither intentional nor negligent. The Court finds otherwise. See, In the Matter of Ward LaFrance Truck Corpora-

tion, 13 S.E.C. 373 (1943). Skogmo's failure, as the surviving corporation, to make the material disclosure concerning its intent to sell the remaining outdoor advertising properties of General was, under the circumstances, intentional. Even absent intent to deceive, Skogmo's failure to disclose this material fact would constitute deception and under the most favorable light its conduct constituted negligence. Skogmo also had the duty to reveal in the textual portion of the proxy statement its appraisals of the values of the remaining unsold outdoor advertising properties over their respective net book values together with any bona fide offers for these properties. Its failure to disclose these facts was obviously intentional. It may be that in this case Skogmo was acting under a misconception of the law, which of course is no excuse. Nor can Skogmo escape liability for its failure by reference to its conference with representatives of the Securities and Exchange Commission because the Commission was not informed of the intent to sell and accordingly the vital information was not "prospective information" (see Rule 14a–9(b)). The conclusion is inevitable that Skogmo's concealment of the above material facts made the proxy statement false and misleading, although the nondisclosure of either would have been material under the circumstances. Accounting and restitution are accordingly the proper remedies.

## XI

### CLASS ACTION

Plaintiffs instituted this action as a "true" class action under the old Rule 23(a) (1), Fed.Rules Civ.Proc., 28 U.S. C.A., purporting to represent all of General's stockholders except Skogmo. The Court was not asked to apply the new Rule 23, Fed.Rules Civ.Proc., 28 U.S.C.A., but it concluded, under the circumstances, that its application would not have been feasible.[12] Had the Court

---

12. This action was instituted and the motion for summary judgment made before

the new Rule 23 became effective, and Judge Dooling held that the action was

applied the new Rule 23.1, however, the result here reached would have been the same. The present action represents a consolidation of two actions, one in this District and the other in the District of Delaware. The complaint rests upon a violation of Section 17(a) of the 1933 Act, Sections 10(b) and 14(a) of the 1934 Act and Rules 10b–5 and 14a–9 of the Securities and Exchange Commission issued thereunder, and a breach of fiduciary obligation. Plaintiffs, in their brief, add a violation of another section, i. e., Section 12 of the 1933 Act.

A "true" class action under the old Rule 23(a) (1) in this case would lie for a common law breach of fiduciary obligation [13] (Southern Pacific Co. v. Bogert, *supra*) and under the old labels the class suit would be for the enforcement of a secondary right. A class action would also be an appropriate means of expeditiously litigating the issues raised under Section 12 and 17(a) of the 1933 Act and Section 10(b) of the 1934 Act. These sections embody a new and expanded concept of fraud for the protection of investors from exploitation by insiders in an infinite variety of transactions. They are not limited to specific acts or practices and it is doubtful from the facts in this case whether a "true" class suit is available under those sections. See, Green v. Wolf Corporation, 406 F.2d 291, (2d Cir. 1968). On the other hand, Section 14(a) of the 1934 Act and Rule 14a–9 are addressed specifically to nondisclosure in proxy statements and a true class action may here be instituted for violations thereof. Defendant claims that the facts here alleged do not lend themselves to a derivative action on behalf of the corporation because General is no longer in existence. There is no validity to this argument. When a corporation becomes non-existent under such circumstances as the present, the corporate right to sue devolves upon the shareholders. *Cf.*, Bacon v. Robertson, 18 How. 480, 15 L.Ed. 499 (1856); Vine v. Beneficial Finance Company, *supra*. Defendant further urges that plaintiffs have no standing to bring a representative action inasmuch as they do not represent the great body of stockholders. This claim is predicated upon the assertion that none of the plaintiffs voted for the merger and that therefore they are not in a position to represent those who did so vote and who are obviously satisfied with the result as illustrated by the fact that none of such stockholders has intervened. This assumes that the non-complaining stockholders knew all the facts and are nevertheless satisfied. Silence, of course, cannot be taken as approval. Pennsylvania Co. For Insurances, Etc. v. Deckert, 123 F.2d 979, 984 (3d Cir. 1941). It is inconceivable that stockholders who voted on the basis of this proxy statement were not deceived. It is equally unbelievable that those who were deceived in voting for the merger and entitled to participate in restitution would not wish to be represented by the plaintiffs. See, Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968).

Section 14(a) and Rule 14a–9 provide two grounds for a class action upon a violation of the rule, (i) a derivative cause of action, and (ii) a primary cause of action either on behalf of himself or on behalf of the body of stockholders who have been injured. The derivative action exists because the "injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation". J. I. Case Company v. Borak, *supra* (377 U.S.

a "true" class suit under the old Rule 23(a). Neither party has suggested that the interest of justice requires the application of the new Rule. Amendments to Rules of Civil Procedure, etc., 86 S. Ct., subdivision 2 of Order, p. 183.

13. Federal jurisdiction having been otherwise obtained, plaintiffs may assert their claim of common law breach of trust. United Mine Workers of America v. Gibbs, 383 U.S. 715, 724–727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933).

p. 432, 84 S.Ct. p. 1560, 12 L.Ed.2d 423) ; see also, Subin v. Goldsmith, 224 F.2d 753 (2d Cir. 1955), cert. denied, 350 U.S. 883, 76 S.Ct. 136, 100 L.Ed. 779 (1955), and Loss, Private Actions Under the Proxy Rules, 73 Harv.L.R. 1041, 1062 (1963). The primary action results from a violation of Section 14(a) in the deceit practiced not only upon the complaining stockholder but also upon the stockholders as a group. Dann v. Studebaker-Packard Corporation, *supra.*

This primary right is therefore common to all stockholders within the meaning of the old Rule 23(a) (1) defining the so-called "true" class action. In view of the fact that General is no longer in existence, the essentially derivative action on behalf of General would be meaningless and the courts have under those circumstances treated such an action as a primary suit. See, Perlman v. Feldmann, 219 F.2d 173, 50 A.L.R.2d 1134 (2d Cir. 1955), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955). The appropriate class of stockholders includes all those who were injured because of the false or misleading statements injected in the proxy material, and each stockholder not only has an individual right not to be so misled but also has the right to insist that other stockholders be free from false and misleading statements in the exercise of their franchise even if he himself has not been misled. Thus the rights of those who voted for the merger because of misrepresentations and of those who may not have been misled into voting for the merger are essentially the same. The breach of duty in both cases is the same. The proof required to establish the right by either class of stockholders is identical but the relief in both cases may or may not be identical, depending upon knowledgeable consent or wrongful participation by those who were not deceived. It is unnecessary for a plaintiff to establish his particular reliance if it can be demonstrated that the misrepresentation had a causative effect upon the vote of the stockholders as a group. Reliance may be inferred from the effect unless the defendant proves otherwise. Therefore this action may be maintained as a "true" class action. Since the plaintiffs seek damages rather than actual rescission, they adequately represent the class. The problem of potential antagonistic interests of the shareholders inherent in a suit for injunction or the return of specific property by reason of rescission is not here present. *Cf.,* Hansberry v. Lee, 311 U.S. 32, 44, 61 S.Ct. 115, 85 L.Ed. 22 (1940) ; Carroll v. Associated Musicians of Greater New York, 206 F. Supp. 462 (S.D.N.Y.1962), affirmed, 316 F.2d 574 (2d Cir. 1963).

## XII

## CONCLUSIONS

The foregoing constitutes the Court's findings of fact and conclusions of law which, in brief, may be summarized as follows: (1) The merger of General with Skogmo was legal under the New Jersey merger law; (2) There was no duty on Skogmo to liquidate General for the benefit of stockholders pursuant to Section 337 of the Internal Revenue Code of 1954; (3) There was no breach of fiduciary obligation by Skogmo in causing General to purchase and sell the stock of the Channing Corporation and in causing General to purchase the stock of the Allegheny Corporation; (4) At the time the proxy statement was prepared (i) Skogmo had in its possession appraisals of the unsold outdoor advertising properties of General made by Skogmo's and General's personnel qualified for the purpose, which showed current liquidating values of those assets at figures higher than the historical figures carried in the financial statements attached to the proxy statement, (ii) Skogmo intended to sell the remaining outdoor advertising plants of General immediately after the merger, and (iii) it was Skogmo's duty to insert in the textual portion of the proxy material the appraised values of the unsold outdoor advertising plants of General, and also to specifically disclose its intent to sell those assets immediately after the

merger; (5) The appraisals and the intent to sell were material facts which were intentionally omitted and these omissions made the proxy statement, upon which General's stockholders relied in casting their favorable vote for the merger, false and misleading in violation of Sections 10(b) and 14(a) of the 1934 Act and Rules 10b–5 and 14a–9 issued thereunder; (6) Skogmo's failure to make the disclosures specified in item 4 hereof, as well as its failure to present a fair plan of merger, breached its fiduciary obligation as a majority stockholder of General; (7) Skogmo's defense of fairness of the plan and its defense of innocence are irrelevant as a matter of law and without merit as a matter of fact; (8) The plan of merger was unfair because Skogmo did not attribute sufficient weight to the underlying liquidating values of General's unsold outdoor advertising assets and predicated the exchange primarily upon comparative stock market values; (9) A "true" class action may be instituted by the plaintiffs; and (10) Accounting and restitution is the proper remedy against the defendant.

## XIII

### DECREE

Accordingly, a form of decree requiring an accounting and restitution from Skogmo is hereby ordered to be entered providing for the appointment of a Special Master pursuant to Rule 53, Fed. Rules Civ.Proc., 28 U.S.C.A., to hear and report upon the accounting and amount of restitution to be paid by Skogmo to the plaintiffs and those similarly situated upon the following conditions:

(a) Skogmo is entitled to a credit for (i) the loss on the Carlson "put" agreement with respect to the Channing stock, net of tax credits; (ii) capital gains taxes on post-merger sales gains; (iii) post-merger cash losses on United States operations, net of tax credits; and (iv) a reserve in the nature of a reserve for bad debts for the unpaid portion of the purchase notes acquired by General as of the date of restitution, if the experience of the collectibility of the purchase notes as of that date justifies such a reserve.

(b) Skogmo is not entitled to any credit for obtaining or effectuating on behalf of General the sale of the purchase notes to the First National Bank of Chicago syndicate.

(c) After proper deduction for Skogmo's proportionate interest in General's assets as of the date of the merger, plaintiffs are entitled to the highest value since the date of the merger of all the assets transferred to Skogmo by General including post-merger appreciation of said assets less (i) Skogmo's proportionate share thereof, and (ii) the value of Skogmo stock as of the date of the merger received by those shareholders who have exchanged their shares or to be received by those who have not yet exchanged their shares. See, Speed v. Transamerica Corporation, *supra*; Perlman v. Feldmann, *supra*.

(d) Skogmo and any other General stockholder who voted for the merger with full knowledge of the nondisclosures in the proxy statement and of the breach of the fiduciary obligation described herein shall be barred from the foregoing relief but the burden of establishing such bar shall rest upon Skogmo.

Settle order within twenty (20) days upon ten (10) days' notice.

## APPENDIX

### SUPPLEMENTAL FINDING ON FAIRNESS

Since Skogmo, as a majority stockholder, exercised a controlling influence over the affairs of General, the burden of proving fairness of the terms of the merger plan rests upon it. In determining this question, the defendant presents a two-fold attack, (1) fairness by reason of a comparison of the earnings and market performance of the common stock of General with the common stock of Skogmo upon a going-concern basis, and (2) fairness based upon the valuation appear-

ing from an adjusted balance sheet of the net assets, after deduction of all liabilities, of General as of October 17, 1963, as compared to the value of the preferred stock of Skogmo received by General's stockholders. In the second category the pivotal issues are (a) the value of the purchase money notes received by General, and (b) the value of the stock of the Claude Neon subsidiary owned by General. With respect to both points the defendant has offered the testimony of its experts.

I

## STOCK MARKET VALUES

To begin with, the approach of market value comparison of the two stocks is faulty because based upon the hypothesis that General would continue in the outdoor advertising business and thereafter receive only 3% return upon the estimated value of its unsold domestic outdoor advertising plants. In support of the market value comparison, defendant produced the testimony of Claire Hansen of Duff, Anderson & Clark, Chicago investment advisers and analysts. His analysis was in many respects similar to that of Paul Judy of A. G. Becker & Co. He made a study in depth of the price ranges of the stocks of the two companies, their respective price earnings ratio, yield, return on capital, their ability to maintain a competitive position in their respective industries, and their basic earning power. He also made a comparison of the earnings of Skogmo with that of seven selected companies and observed that when the merger terms were made known, the common stock of Skogmo and of General was selling at approximatey the same price. It was his opinion that based upon future prospective earnings, the Skogmo stock was properly valued and the General stock was over valued by the market. Consequently, he concluded that the exchange of the Skogmo convertible preferred

stock with a higher yield than the General common stock upon a share-for-share basis, was very fair to General's stockholders. While he stated that the market knew that General's plants could be sold for more than the book value, his analysis of General's earnings was predicated upon the assumption that General would continue an investment of approximately $24,000,000 in the domestic outdoor advertising business and that its prospective earnings were approximately $1.40 per share. Knowing that the plants were to be sold and liquidated, it is an exercise in futility to compare market values of the two stocks on a going-concern basis.

Hansen admitted on cross-examination, however, that if the properties were sold and the funds reinvested in an operation similar to Stedman's the results would be as follows: $1.65 from the reinvested proceeds, $1.40 from Stedman earnings, and $.65 from Claude Neon earnings, producing a total of $3.70. Hansen's opinion that even if this did occur, the General stock should be valued by a multiplier of 10 to 12 times earnings, which would produce a stock value approximately equal to its selling price. On the other hand, it was Hansen's opinion that in computing the value of Skogmo stock, he would use a price earning ratio of 19 based upon comparative merchandising operations of similar companies. There does not appear any logical reason why General's potential earnings should be valued by a multiplier of 10 to 12 times earnings as compared to Skogmo's multiplier of 19. Inasmuch as the market was never informed of Skogmo's intention to sell the remaining General domestic outdoor advertising plans, one must assume that the market's appraisal of the value of General's stock was based upon earnings of $1.40 per share, which under the circumstances would be erroneous. For these reasons this expert's opinion as to the fairness of the merger, based solely upon earnings and market performance, was of little value. Stock Market value comparisons of the two stocks do not demonstrate the fairness of the plan.

## II

## BALANCE SHEET VALUATION

There are many standards of valuation of common stock depending upon the purpose of the valuation including the corporation's operations, its balance sheet, its income statement and its continuance as a going concern. Stock market valuations with certain exceptions rarely consider asset values of great importance. Graham, Dodd, Cottle, Security Analysis, Principles and Technique (4th Ed.) p. 551. Ordinarily relative book values are not critical in determining the fairness of a plan since shares are exchanged for shares not assets for assets upon a merger and stock values are appraised upon a going-concern basis of both companies.

Brundage v. The New Jersey Zinc Company, *supra*.

But in view of the contemplated liquidation of General, plaintiffs questioned the defendant's formula of valuing the stocks of the two companies based upon market quotations and price earnings ratio. Defendant, in reply, has attempted to show that even upon an asset-valuation basis, assuming a transitional period involving the sale of part of it asssets, the total assets transferred by General to Skogmo did not exceed $36.23 per share, which was close to the market value of Skogmo's preferred stock. The basis for this formula is a Pro Forma Adjusted Balance Sheet of General as of May 31, 1963, prepared by the defendant, as follows:

### Pro Forma Adjusted Balance Sheet of General
### As of May 31, 1963

| | | | |
|---|---|---|---|
| Current Assets | $ 5,450,608 | Current Liabilities | $12,040,690 |
| | | Long-term Liabilities | 100,400 |
| Investments & Advances: | | | |
| Claude Neon (including Williams Thomas) | | Capital loss on re- purchase and sale of | |
| $ 7,900,000 | | Channing stock | 2,755,957 |
| Stedman 22,448,862 | | | |
| Allegheny 7,627,500 | | Capital gains taxes | |
| Other 1,199,933 | | on post-merger sales | |
| | 49,176,295 | gains reduced by | |
| | | Channing loss | 2,936,011 |
| Other Assets | 548,911 | | |
| | | Valuation reserve on | |
| Property, plant & equipment | 9,133,999 | notes [or value of loan of credit of Gamble-Skogmo] | |
| Excess asset sales price (over book) | 14,500,000 | (net of tax credit) | 6,750,000 |
| | | Reserve for post- merger cash losses on U. S. operations | |
| | | (net of tax credit) | 750,000 |
| | | Stockholders equity* | 43,476,755 |
| Total Assets | $68,809,813 | Total Liabilities | $68,809,813 |

\* $36.23 per share.

On the asset side the defendant values the remaining domestic outdoor advertising plants at approximately $14,500,000, in excess of the book value of $5,450,608,

and Claude Neon at $7,900,000. Plaintiffs' main objection is that Claude Neon was worth substantially more than its book value of $7,900,000, although they also contend that the value of General's stock in Stedman was in excess of $22,448,862. Assuming temporarily the accuracy of these asset valuations by the defendant, the liabilities set up must be substantiated to validate defendant's formula of computing the stockholders' equity. While other liabilities have been questioned by plaintiffs, the one subject to the severest attack is the claim by the defendant that General must set up on the liability side of its balance sheet a reserve for purchase money notes (net of tax credit) in the amount of $6,750,000, representing, in fact, the value of Skogmo's loan of its credit to General in order to effectuate the sale of the notes.

### A. *Assets*

Claude Neon Valuation

" 'Value' is not a single purpose word. Men have all but driven themselves mad in an effort to definitize its meaning. The problem arises in its most perplexing form when, as here, property has not in fact been sold and an effort is made to ascertain what it would have fetched if it had been sold. The answer is obviously a guess." Andrews v. Commissioner of Internal Revenue, 135 F.2d 314, 317 (2d Cir. 1943), cert. denied, 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444 (1943).

Before proceeding with an attempt at Claude Neon valuation, the difference in Canadian taxes payable upon the sale of assets as contrasted to Canadian taxes payable upon the sale of stock must be explained. Without attempting to explore in detail the ramifications of the Canadian tax laws in determining the Canadian taxes which might be imposed on the sale of corporate assets as contrasted to a sale of the controlling stock of a corporation, it is sufficient to point out that there is an important difference under the Canadian tax laws to both the buyer and the seller between the sale of the controlling shares of the corporation and the sale of the assets of that corporation. This was demonstrated by the testimony of the Canadian tax experts produced by the defendant. It is more advantageous for an owner of the majority stock of a corporation to sell stock, rather than assets, whereas it is more advantageous for a buyer to buy assets rather than stock. The reason for this under the Canadian tax laws is that a corporation upon the sale of its assets in excess of cost minus depreciation must pay a tax at ordinary rates upon the amount of recaptured depreciation.[1] If he sells stock, there is apparently no Canadian capital gains tax upon the difference between the cost of the stock and the selling price of the stock.[2] On the other hand, if a buyer purchases assets of a corporation for a price in excess of the cost less depreciation of those assets, he obtains the stepped-up purchase price as a basis for his future depreciation and also as a basis less future depreciation in determining the amount of his tax upon a future sale for a price in excess of such depreciated value. Consequently, a seller is prepared to sell his controlling shares at a substantially lower price than he would cause the corporation to sell assets because of the additional tax liabilities.

Defendant produced the testimony of Harry Siebert of Ford, Bacon & Davis, appraisers and investment counsellors, placing a value of $8,300,000 (Canadian) [C] on the stock of Claude Neon. This result was reached by an estimate of prospective maintainable income of approximately $810,000[C] after Canadian taxes at the rate of 53%, including approximately $120,000[C] of annual capital gains. Siebert then employed a multiplier of 10 times earnings and reached a valuation of $8,100,000[C], to which he added an extra $200,000[C] for an excess of liquid assets over working capital.

---

1. No consideration is here given to the probability of withholding taxes upon liquidation of assets to the stockholder.

2. But the imposition of a United States capital gains tax upon the sale of the stock is a probability.

108

Plaintiffs claim that Claude Neon stock was worth between $15,000,000 and $16,000,000, based, among other things, upon the following: (i) letter of May, 1964 from Mills & Rockleys Limited, the largest outdoor advertising company in Britain, offering to negotiate the purchase of Claude Neon on a formula based upon 5 times pretax earnings (roughly equivalent to Siebert's 10 times post-tax earnings), plus the appraised value of its real estate which, according to appraisals, was worth at least $3,800,000, resulting in a value of approximately $12,100,-000[C]; (ii) Gesme's opinion in March, 1962, after conferring with Donovan M. Olson, then president of Claude Neon, and Burr Robbins, that in fixing the value of Claude Neon the multiplier should be 15 times operational earnings or literally 15 times operational earnings plus capital gains from the sale of real estate, resulting in $12,000,000[C] and $15,000,-000[C], respectively; (iii) letter of August 28, 1964, from Ryan to a Toronto broker, to the effect that $12,500,000 for Claude Neon would not be acceptable, and letter of November 17, 1964 from the same broker that his principals would negotiate for the sale of Claude Neon provided the figure for discussion was no more than $15,000,000; (iv) valuations of Claude Neon in the "Green Book" by Messrs. Dolan, May and Gesme between $15,000,000 and $16,000,000. Whether these figures contemplated the sale of assets or stock is not clear; [3] and (v) the willingness in December, 1964 and January, 1965 of Baker & Gould of Ontario Outdoor Advertising Company to make an offer of $8,300,000[C] for the stock of Claude Neon after the latter had declared a special dividend of $4,500,000 [C] to facilitate the consummation of the purchase. This would have indicated a gross price of $12,800,000[C] before Canadian taxes and imposition of United States taxes, if any. A difference of opinion among the accountants for the respective parties concerning the liability of Skogmo for United States capital gains taxes upon such a sale affecting the net proceeds to Skogmo, prevented the consummation of the transaction.

In fixing a multiplier of 10 times Claude Neon's earnings, Siebert did not have the benefit of any comparable operations and there is evidence of higher valuations by others. Siebert's conclusions are therefore unconvincing. It is impossible to place a precise value on Claude Neon or the net proceeds which Skogmo would receive upon the sale of Claude Neon stock or assets without determining the liability of Skogmo for Canadian taxes and United States capital gains taxes. But it is unnecessary to value Claude Neon upon a sales-price basis involving the payment of such taxes, because it is retained by Skogmo and should be valued as an investment in a going-concern. Upon a going-concern basis the formula of Mills & Rockleys and Baker & Gould indicating a valuation of approximately $12,000,000[C] or $11,160,000 (U.S.) for Claude Neon is adopted. Upon the basis of these figures, Skogmo's 97% interest in Claude Neon stock would be valued at approximately $10,825,200 (U. S.), which is the figure the court adopts. Even if the court were to accept defendant's valuation of its Claude Neon stock, this fact would not be sufficient to tip the balance in the ultimate determination of the fairness or unfairness of the merger terms.

*Stedman*

Stedman was purchased less than a year before the merger for approximately $22,000,000, which the court accepts at this time as its value on May 31, 1963, in the absence of any evidence to the contrary.

B. *Liabilities*

Purchase and Resale of Channing Stock. Interest on Purchase of Allegheny Stock.

Plaintiffs attack Skogmo's claim to a credit for the post-merger loss of $2,755,-957 incurred upon the sale in March,

3. If the sale of assets was contemplated, the net to Skogmo after Canadian taxes would be approximately $11,000,000.

1964 of the Channing stock after Carlson had exercised his "put" agreement with Skogmo for approximately $5,666,000. In addition to this loss, they claim that Skogmo should also be charged with interest on the sum of money employed by General in the purchase of the Allegheny stock, on the theory that the sum was a loan to Skogmo. In causing General to purchase the shares of Channing stock and of Allegheny stock, for the purpose of diversifying its investments, General did not perform any *ultra vires* act nor did Skogmo or the directors of General violate any fiduciary obligation. These transactions were a matter of business judgment and there is no evidence to indicate that either Skogmo or General's directors acted in bad faith or negligently against the interests of the corporation. See, Issner v. Aldrich, 254 F.Supp. 696 (D.Del.1966); Ash v. International Business Machines, Inc., 353 F.2d 491 (3d Cir. 1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966). Both acquisitions represented an effort on the part of the majority stockholders and the directors of the corporations to increase the potential profits of General. Consequently, the defendant is entitled to a credit for the Channing loss and is not chargeable for any interest in connection with the purchase of the Allegheny stock.

### Claim for Capital Gains Taxes of Approximately $3,600,000.

The remaining domestic outdoor plants of General plus the Mexican plants were sold after the merger for a total gross purchase price of $25,081,000 which was approximately $14,500,000 in excess of the book value. Of the $25,081,000, approximately $16,486,000 was paid in cash and $8,595,000 in eight-year notes secured by mortgages. Skogmo contends that it is entitled to a credit for a capital gains tax of approximately $3,600,000 on the sale of these assets and in addition, to a reserve of approximately $6,500,000 for contingent liability on the notes. The obstacle to this credit is that the tax is computed on the assumption that the notes are worth face value, while the discount claimed is based upon the theory

that the notes are worth $6,500,000 less than face value. Since the Court found that the defendant failed to prove the necessity of such a discount or the amount of any reserves against the notes, it will allow the defendant a credit only for the post-merger capital gains tax of approximately $3,600,000.

### Cash Losses on United States Operations (Net of Tax Credit)

Before the post-merger sales of General's assets were consummated, it was necessary to continue the operation of the remaining branches, in the course of which certain cash losses were sustained. A surviving corporation in a merger is ordinarily not entitled to a credit for post-merger cash losses. Since in this case the domestic outdoor advertising plants were appraised upon their liquidating value rather than upon their operational value, the amount of losses incurred in continuing the operation of such plants until the sales were effectuated was a necessary expense. But defendant failed to establish that the post-merger cash losses on United States operations of $750,000 were due exclusively to domestic outdoor advertising operations and consequently this amount cannot be accepted as an established fact. Since the ultimate conclusion will not be changed by including this figure as a liability, it will be accepted upon that condition.

### $9,000,000 Credit ($6,750,000 net of tax credit) as a Valuation Reserve on Notes

This is the most crucial of defendant's contentions. General sold to the First National Bank of Chicago Syndicate $27,-891,299 of 8-year purchasers' notes guaranteed by General and secured by purchase money mortgages and also in some cases by individual guarantees of the corporate owners. While General received cash of the face amount of the notes upon the terms above related, General nevertheless remained contingently liable. Skogmo claims that these notes could never have been sold by General at face value without Skogmo's prior relationship with the bank and its moral commit-

ment as a majority stockholder of General. It asserts that the true value of the notes can be measured only by their selling price in the open market without any Skogmo backing and that the difference between this selling price and the amount received by General for the notes represents a credit to which Skogmo is entitled and which should be charged to General in the merger proceedings in determining the fairness of the plan.

Notes of only twelve purchasers [4] were attacked, aggregating a face amount of $23,960,054, upon which there was due on October 17, 1963 an aggregate amount of $18,197,905. Notes aggregating $11,293,192 of the other nine purchasers were apparently accepted at face value. In support of its thesis, the defendant presented four experts,[5] all of whom testified that these 8-year notes would be unacceptable to regular financial institutions such as banks, insurance companies and pension funds. One expert, Walter A. Stringfellow of Duff, Anderson & Clark, testified from a note valuation schedule prepared by him, showing two valuations of the notes, (1) $15,575,000 after minimum discount, and (2) $13,781,000 after required basic capital expenditures. He also testified from a schedule prepared by him with respect to each purchaser, which included, among other things, the balance sheets and income statements of the individual purchasers. From a banking standpoint, he claimed that both the balance sheets and the income statements of these particular companies were unsatisfactory. The balance sheets showed that there was a disproportionate relationship of liabilities to the net worth and that the income statements, with one or two exceptions,

indicated that the debt maturities of the notes before depreciation and amortization were not fully earned. It was the opinion of all the defendant's experts that if the notes of these purchasers could be sold, they could be sold only to certain individual investors who would demand a discount of approximately $9,000,000 and that, in addition, General would probably be required to pay a finder's fee. In reaching this conclusion, the experts attached no importance to General's guarantee or to the collateral in the way of mortgages or personal guarantees which might have supported the notes. The acceptance of the opinion that the notes, if sold under such conditions to .individual investors, would be subject to a discount of approximately $9,000,000, would still not resolve the issue.

The Court believes that all this testimony is irrelevant and that in determining the fairness of the merger Skogmo is not entitled to any credit for the sponsorship of the sale of the notes to the First National Bank of Chicago Syndicate. Here we are not dealing with hypothetical cases or possibilities but with actual facts. The notes executed before the merger had already been sold to the First National Bank of Chicago Snydicate at their face value before the merger and those generated after the merger had been contracted to be sold at face value upon the completion of further plant sales. The original contract, as amended was executed in December, 1962, prior to any discussion of merging or consolidating General with Skogmo. Skogmo owned 50.12% of General's stock and was vitally interested in preserving its investment by assisting General in immediately selling the purchasers' notes and obtain-

4. Purchaser's name follows the plant purchased:
 Hartford—Colonial Outdoor Advertising, Inc.; Binghamton and Utica—Park Outdoor Advertising, Inc.; Memphis—King & Stanley Company, Inc.; Oklahoma City—National Outdoor Advertising Co.; Akron, Indianapolis and Youngstown—Carlson; Harrisburg—Capital Outdoor Advertising, Inc.; Louisville—Alwes Outdoor Advertising Co.; Asheville, Kinston, Raleigh, Winston-Salem and Jacksonville—Carlson; Denver, Duluth and Omaha—Carlson; Minneapolis—Naegele Outdoor Advertising Company of Minn., Inc.; Atlanta, Richmond and Roanoke—R. Edward Turner; Peoria—Logeman Outdoor, Inc.

5. Walter A. Stringfellow; Hiram W. Emery; Harold Levin; Robert B. Scott.

ing the proceeds for Skogmo's policy of growth and diversification. It made no charge to General at the time of the agreement or at any other time for any services rendered in connection with the sale of present or future notes, nor did such a credit at any time enter the discussions of the parties when passing upon the merger terms. There is no legal basis for any such credit, nor is there any evidence that the services rendered by Skogmo subjected it to any cost or liability. As a matter of fact, the discount price to private investors of these notes is unrelated to and does not represent the cost of any banking services.

Since General is contingently liable upon the notes to the bank, there remains a question of whether a bad debt reserve should have been set up against these notes. No such reserve was set up by Price Waterhouse & Co. in the financial statements attached to the proxy statement, although they noted that the notes were subject to collectibility. One of the partners of this firm testified that General had insufficient experience with these notes to enable the accountants to fix a proper reserve and that their action was in accordance with generally accepted accounting principles. In the balance sheet attached to Skogmo's annual report for 1964 sent to its stockholders in March, 1965, no reserve was set up in the financial statements, certified by Peat, Marwick, Mitchell & Co., for these notes nor any notation concerning their collectibility. An examination of the financial statements of these purchasers, above considered, does suggest some possible risk of uncollectibility regarding these notes. When Stringfellow was asked what he thought a proper reserve would be under the circumstances, he stated that the amount of the discount of $6,000,000 would be proper. He offered no criteria which could explain why a reserve in such an amount was necessary. The Court rejects this opinion. In setting up a realistic reserve for these notes, if any is possible at this time, one cannot ignore, as apparently Stringfellow did, the other factors present which were not weighed in fixing the amount of discount upon a private sale. These included General's credit, the collateral behind the notes and the fact that the purchasing corporations which acquired the properties consciously did so without adequate capital. But the owners of the corporations were individuals, all of whom had experience in the outdoor advertising business and most of whom were wealthy or responsible and when necessary in most cases obtained sufficient funds for the corporations to enable them to pay installments on the notes. There was no reserve set up for these notes in General's balance sheet attached to the proxy statement. Therefore, in the absence of any plausible evidence as to the amount of any bad debt reserve required, the notes should be taken at their face value as included in that balance sheet. Defendant is not entitled to a valuation note reserve credit of $6,750,000 and has thus failed to prove the fairness of the merger by an asset and liability evaluation.

Under either theory advanced by Skogmo, assuming fairness was relevant, the Court concludes that it has failed to carry the onus of proving the fairness of the merger plan.